**JOHN R. SAND & GRAVEL COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 02–509 L.

United States Court of Federal Claims.

Oct. 29, 2004.

Jeffrey K. Haynes, Bloomfield Hills, MI, for plaintiff.  L. Rider Brice, III, Bloomfield Hills, MI, of counsel.

John S. Most, with whom were Thomas L. Sansonetti, Assistant Attorney General, Su-

san V. Cook and Steven Bryant, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Judge.

This case is before the court following trial on plaintiff John R. Sand & Gravel Co.'s claim that the federal government violated the Fifth Amendment of the United States Constitution by physically taking plaintiff's property interest during the environmental remediation of the Metamora Landfill in Lapeer County, Michigan. First Supplemental Complaint (Supp.Compl.) ¶¶ 1, 2, 51–71.

## I. Background [1]

In 1969, plaintiff John R. Sand & Gravel Co. (John R. Sand) leased from Russell and Mildred Parrish a tract of land in Metamora Township, Lapeer County, Michigan for a term of fifty years. Stipulated Facts (Stip.Facts) ¶ 1; Joint Exhibit (JX) 1 (Sand and Gravel Lease (Lease)). Plaintiff's Lease from the Parrishes included an area used as a landfill (the Landfill). *See* Transcript of Trial (Tr.) at 362:11–24 (Testimony of Mr. Evatz, stating that the Metamora Landfill is included within plaintiff's leasehold); Stip. Facts. ¶ 3 (stating that the northern portion of plaintiff's leasehold includes the Metamora Landfill site); *see also John R. Sand & Gravel Co.*, 57 Fed.Cl. 182, 183 n. 3 (2003) (describing plaintiff's 158–acre leasehold as "rectangular in shape" with plaintiff's primary operations located in the property's center and a north-south access road just to the west of this area).[2]

Russell Parrish began operating an unregulated, open dump, known as the "Metamora

---

1. For additional background information, see *John R. Sand & Gravel Co. v. United States*, 60 Fed.Cl. 230, 232–33 (2004) (granting defendant's cross-motion for summary judgment that the nuisance exception can be available as a defense in a physical takings case and denying the balance of defendant's cross-motion and plaintiff's motion for summary judgment); *John R. Sand & Gravel Co. v. United States*, 59 Fed.Cl. 645, 647–48 (2004) (denying motion to intervene by group of entities who participated in the remediation of the Metamora Landfill site), *appeal docketed*, No. 04–5066 (Fed.Cir. Feb. 27, 2004); *John R. Sand & Gravel Co. v. United States*, 57 Fed.Cl. 182, 193 (2003) (denying "defendant's motion for summary judgment that plaintiff's complaint is time-barred . . ., except with respect to the monitoring wells not abandoned and still in operation").

2. For convenient reference, the name and a description of each witness on whose testimony the court relies in this opinion follows:

Dr. James R. Campbell is the president of Engineering Management and became the project manager for the Metamora Landfill site investigation and remediation in 1992. Tr. at 50:25–52:22 (Testimony of Dr. Campbell).

Lt. Gregory C. Eagle has been the supervisor of a unit of detectives specializing in investigating environmental offenses in the Office of Criminal Investigations at the Michigan Department of Environmental Quality (MDEQ) since 1987. Tr. at 703:16–704:13 (Testimony of Lt. Eagle). Lt. Eagle first became involved in the Metamora Landfill site in 1980 when he was asked to do some field work at the site because of its placement on a list of sites of potential or known contamination. Tr. at 705:9–22 (Testimony of Lt. Eagle).

Edward W. Evatz, Jr., is the current President of John R. Sand & Gravel Co. Tr. at 355:10–23 (Testimony of Mr. Evatz). He became president in 1992. Tr. at 355:24–356:1 (Testimony of Mr. Evatz). In 1969, when plaintiff leased the Metamora site, Mr. Evatz's father ran the sand and gravel operation at the site. Tr. at 361:1–9 (Testimony of Mr. Evatz). Mr. Evatz began working at the site in 1970. Tr. at 468:3–6 (Testimony of Mr. Evatz).

Mark A. Henry has been employed by the MDEQ and its predecessor, the Michigan Department of Natural Resources since 1980. Tr. at 858:15–859:8 (Testimony of Mr. Henry). He currently works as a Project Manager and the only environmental engineer in the Superfund Section of the Remediation and Redevelopment Division of MDEQ. Tr. at 862:23–24, 863:8, 865:3–5 (Testimony of Mr. Henry). The Superfund Section works with the United States Environmental Protection Agency (EPA) on environmental sites in Michigan that are on the National Priorities List, a list of the most contaminated sites in the country. Tr. at 863:8–18 (Testimony of Mr. Henry). Mr. Henry first began working at the Metamora Landfill site in 1998. Tr. at 863:23–864:4 (Testimony of Mr. Henry).

James A. Reid has held various positions at Conestoga–Rovers & Associates (CRA) and is currently an Associate, which is the first management level below the vice president. Tr. at 587:1, 588:2–14, 589:7–14 (Testimony of Mr. Reid). Mr. Reid served as Project Engineer at the Metamora Landfill site from 1992–1993. Tr. at 589:4–6, 590:2–7 (Testimony of Mr. Reid). He then became a Project Coordinator at the site and is now the Project Manager. Tr. at 590:8–13 (Testimony of Mr. Reid).

James J. Sygo is currently the Deputy Director for the Waste and Hazardous Materials, Air

Village dump" in 1955. *See* Defendant's Exhibit (DX) 103, at 0039779 (Deposition of Eugene L. Parrish in *Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, No. 88 CV 73445 DT (E.D. Mich. May 10, 1989) [Parrish Deposition], stating that his father, Russell Parrish, began operating the Metamora Village dump in 1955); JX 5, at 01280 (United States Environmental Protection Agency, Record of Decision (1990) [1990 ROD], stating that the Landfill began in 1955 as a "privately owned, unregulated open dump"). In 1966, the dump was converted into a landfill. DX 103, at 0039779–80 (Parrish Deposition, *supra*); DX 71 (Mich. Dep't of Natural Res., Metamora Landfill, Lapeer County, Magnetometer Survey at 1 (1982) [Magnetometer Survey]). It was also in 1966 when the Landfill began accepting refuse from commercial haulers, including liquid waste in fifty-five gallon drums. DX 103, at 0039780–81 (Parrish Deposition, *supra*). "In 1969, the landfill was upgraded to meet existing standards, and licensed to receive general refuse." JX 5, at 01280 (1990 ROD, *supra*). In the mid- to late–1970s, Eugene Parrish, Russell Parrish's son, took over operation of the Landfill, *see* DX 71 (Magnetometer Survey, *supra*, at 1, stating that Eugene Parrish "assumed full control of the facility operation in 1978"); DX 103, at 0039806 (Parrish Deposition, *supra*, stating that Eugene Parrish took over operation of the Landfill in 1974 and stopped

accepting drums at the Landfill). The Landfill lost its license in 1979, DX 71 (Magnetometer Survey, *supra*, at 1), and closed in 1980, DX 103, at 0039905 (Parrish Deposition, *supra*); DX 51 at 1 (Schedule for Final Closure in In re Metamora Sanitary Landfill (Mich. Dep't of Natural Res. Sept. 17, 1980) ("Further receipt of refuse shall be terminated as of November 30, 1980.")).

Following closure of the Metamora Landfill in 1980, "several environmental site investigations were conducted, culminating in the inclusion of the site on the [EPA's] National Priorities List [pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (2000)] on October 15, 1984." JX 57, at 0007 (Eder Associates, Metamora Landfill Site Remedial Action Close–Out Report (1994)); *see also* Stip. Facts ¶ 6 (stating that the EPA placed the Metamora Landfill site on its National Priority List of Hazardous Waste Sites in 1984). These investigations identified contaminants of concern (including volatile organic compounds and polychlorinated biphenyl compounds) in buried drummed liquid and solid wastes. JX 57, at 0007 (Eder Associates, Metamora Landfill Site Remedial Action Close–Out Report (1994)). For purposes of remediation, the site was divided into two phases: Operable Unit 1 addressed drum

Quality and Remediation and Redevelopment Divisions at the MDEQ. Tr. at 1142:15–23 (Testimony of Mr. Sygo). He has been working at the MDEQ for twenty years. Tr. at 1143:5–9 (Testimony of Mr. Sygo). Mr. Sygo became familiar with the Metamora Landfill site when he worked in the MDEQ Saginaw District Office. Tr. at 1155:18–23 (Testimony of Mr. Sygo). He visited the site on one occasion in 1984, and his division was involved in evaluating the characterization of the wastes that were being removed from the site. Tr. at 1155:23–1156:9 (Testimony of Mr. Sygo). Mr. Sygo was also involved in the evaluation of the possible placement of a permeable cap on the site. Tr. at 1156:4–6 (Testimony of Mr. Sygo).

Glenn Turchan is currently Executive Vice President at CRA, but he also functions as an engineer. Tr. at 1004:15, 1005:3–1006:2 (Testimony of Mr. Turchan). He specializes in environmental engineering and hydrogeology. Tr. at 1006:8–9 (Testimony of Mr. Turchan). Mr. Turchan first became involved with work at the Metamora Landfill site in 1990. Tr. at 1008:20–1009:1

Thomas T. Williams is the current EPA Remedial Project Manager for the Metamora Landfill site. Tr. at 292:12–23, 293:19–23 (Testimony of Mr. Williams). He became the Remedial Project Manager of the site in 1998. Tr. at 294:10–12 (Testimony of Mr. Williams). The primary duty of a Remedial Project Manager is to supervise the cleanup of hazardous waste sites. Tr. at 292:24–293:6 (Testimony of Mr. Williams).

Dr. N. Luanne Vanderpool has been a geologist at the EPA since 1988. Tr. at 764:8, 765:3–5, 769:13–14 (Testimony of Dr. Vanderpool). She provides technical support to the Superfund program and specializes in hydrogeology, the study of processes related to groundwater. Tr. at 765:5–18 (Testimony of Dr. Vanderpool). Dr. Vanderpool became involved with the Metamora Landfill site at the request of Mr. Williams in 1999 when changing the groundwater remedy at the site was under consideration. Tr. at 766:20–767:2, 770:11–771:8 (Testimony of Dr. Vanderpool).

excavation and removal, and Operable Unit 2 addressed the remediation of the rest of the site, including the Landfill and the ground-water.[3] Tr. at 1010:16–1011:14 (Testimony of Mr. Turchan). The EPA issued Records of Decision (ROD) which describe the problem and the remedy chosen for each operable unit. *See* Tr. at 898:12–16 (Testimony of Mr. Henry, defining a ROD as a document that provides "a description of the problem and a commitment by the EPA to have certain work performed in response to the environmental conditions at the site"). It is the remedy for Operable Unit 2 that led to construction of a perimeter fence around the Landfill site. *See* JX 5, at 01314 (1990 ROD, *supra*, calling for the "[i]nstallation of fencing to restrict access to areas of the Site where certain remedial measures are to be installed"). The fence is part of the Landfill cap system, which consists of

(a) a cap extending to approximately the edge of the waste, (b) a gradual slope from the top of the cap to permit surface water to run down and away from the landfill mass and to prevent erosion, (c) stormwater ditches and retention pond, (d) access roads, (e) site-security fence to control access, (f) installation, monitoring, and maintenance of a landfill gas venting system, and (g) implementation of access/deed restrictions.

Stip. Facts. ¶ 16; *see also* JX 5, at 01313–14 (1990 ROD, *supra*, describing the selected remedy). Although the fence was moved many times, *see* DX 248 (Conestoga–Rovers & Associates, Current and Historical Fence Alignments, 1991–2003 at 1–2 (2004)), the May 1998 fence, which plaintiff alleges caused the physical taking of plaintiff's property interest, *see* Plaintiff's Brief Concerning [Expert Opinion Testimony and Accrual Date] at 10 ("The physical occupation occurred when [plaintiff] was permanently ex-

cluded from the Area of Institutional Controls portion of its leasehold. This event occurred in May 1998 when government agents installed a fence around the Area of Institutional Controls."), enclosed what is known as the "Area of Institutional Controls" (AIC).[4] *See* Tr. at 118:3–4, 120:11–17 (Testimony of Dr. Campbell, stating that paragraph 6(g) of JX 45 describes the AIC); JX 45 (Administrative Order Directing Compliance with Request for Access in *In re Metamora Landfill Site*, No. 97–C–379 ¶ 6(g) (EPA Dec. 18, 1996), describing "the area covered by the landfill cap"). The fence was relocated again in December 2003 to enclose a smaller area. Tr. at 154:24–155:23 (Testimony of Dr. Campbell); *see also* DX 248 (Conestoga–Rovers & Associates, Current and Historical Fence Alignments, 1991–2003 at 2 (2004)).

When plaintiff entered into the Lease with the Parrishes, in 1969, refuse had been dumped on the northern portion of the leased property for fourteen years (since 1955). The Parrishes then continued to operate the Landfill during the first eleven years of plaintiff's lease term, until 1980. In 2002, four years after the construction of the May 1998 fence, plaintiff filed suit in this court, seeking compensation for the federal government's alleged physical taking of plaintiff's property. Supp. Compl. ¶ 1. Before this case reached trial, the parties filed two rounds of summary judgment motions. In the court's first summary judgment opinion, the court decided that plaintiff's taking claim was not time-barred (except with respect to the "areas of the [p]roperty covered by permanently installed and not abandoned monitoring wells"). *John R. Sand & Gravel Co. v. United States*, 57 Fed.Cl. 182, 189, 193 (2003) (*John R. Sand I*). In the court's second summary judgment opinion, the court inter-

---

3. "[T]he concept with the operable units was that if you had different media or different types of issues, you could split the project into different operable units." Tr. at 1017:9–12 (Testimony of Mr. Turchan).

4. "Institutional controls" is a term used by the EPA to describe "controls [that] are placed on the property for specific reasons, typically to protect individuals from future exposures, along with ensuring that the property remains in a

protective condition." Tr. at 314:5–12 (Testimony of Mr. Williams). The Metamora Landfill AIC was developed in 1998, before the Landfill cap design was completed. Tr. at 154:2–4 (Testimony of Dr. Campbell). The fence was designed to enclose the area needed to complete the construction of the Landfill cap and to be the area of institutional controls. Tr. at 154:4–11 (Testimony of Dr. Campbell).

.

preted the Supreme Court's articulation of the nuisance and background principles exceptions to takings liability in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), to apply to physical takings. *John R. Sand & Gravel Co. v. United States*, 60 Fed.Cl. 230, 239 (2004) (*John R. Sand II*). The court found, however, that the exceptions did not apply to the facts as then presented to the court. *Id.* at 250–51.

In the summer of 2004, the court conducted a five-day liability trial in Detroit, Michigan, during which the court heard the testimony of thirteen witnesses and admitted into evidence some 110 exhibits. Plaintiff argued that its Lease is a valid property interest; that its property interest is not encumbered by background principles of Michigan property or nuisance law, or in any other significant manner; and that a portion of its leasehold was permanently taken by defendant's actions. Plaintiff's Post Trial Brief (Pl.'s Br.) at 30–31. Defendant argued that plaintiff does not have a valid property right to mine sand and gravel, Defendant's Opening Post–Trial Memorandum (Def.'s Br.) at 23–34; that plaintiff acquired its property interest subject to the Landfill, *id.* at 34–43; that mining would create a nuisance and violate state law, *id.* at 43–58, 70–78; and that defendant did no more than duplicate the result that would have been reached under background principles of state law, *id.* at 58–70.

In addition to the trial record, the court had the opportunity to consider post-trial briefings filed by the parties. Factual findings, in addition to those described above, will be made, as necessary, in the sections that follow.

## II. Discussion

The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause was "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4

L.Ed.2d 1554 (1960); *see also Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 (Fed.Cir.2004) ("The purpose of [the Takings Clause] is to prevent 'Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" (quoting *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978))).

■ The Supreme Court has recognized that the government may take private property either by physical invasion or by regulation. *See Lucas*, 505 U.S. at 1014–15, 112 S.Ct. 2886 (stating that the Takings Clause was interpreted to apply only to physical takings until 1922, when the Supreme Court stated that a regulation that goes too far will be recognized as a taking). This case involves an alleged physical taking. A physical taking occurs "when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). The first step in analyzing a physical taking claim is to determine whether a claimant has a property interest. *See, e.g., Am. Pelagic Fishing Co.*, 379 F.3d at 1372 ("First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment."); *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1580 (Fed.Cir.1993) (stating, in a physical takings case, that "[a] taking compensable under the Fifth Amendment inherently requires the existence of 'private property.'"). The second step in a takings analysis is to determine whether a taking has occurred. *See, e.g., Am. Pelagic Fishing Co.*, 379 F.3d at 1372 ("Second, after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest."); *Skip Kirchdorfer*, 6 F.3d at 1582 ("To recover under the Takings Clause, a claimant with a recognized property interest must show that its interest was 'taken.'").

■ A plaintiff bears an initial burden of demonstrating that a property interest exists. *See, e.g., Skip Kirchdorfer*, 6 F.3d at

1580 ("[T]he plaintiff must show a legally-cognizable property interest."). Courts look to state law "to define the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments." *Lucas,* 505 U.S. at 1030, 112 S.Ct. 2886. If background principles of a state's nuisance and property law bar a property owner from using land in a certain way, then the Takings Clause does not require compensation for an alleged taking to abate that use. *Id.* at 1031–32, 112 S.Ct. 2886. To resist compensation under this theory, "[the defendant] must identify background principles of nuisance and property law that prohibit the uses [the plaintiff] now intends in the circumstances in which the property is presently found." *Id.* at 1031, 112 S.Ct. 2886. If a defendant can show such an inherent limitation in the plaintiff's title, then nothing is taken. *Id.* at 1031–32, 112 S.Ct. 2886.[5]

The court examines plaintiff's taking claim within the framework set out by the court's prior opinion in *John R. Sand II:*

> First, plaintiff must demonstrate that it possesses a property interest. Second, defendant must identify background principles of Michigan property or nuisance law that would prohibit the use of the land plaintiff intends. This step involves determining the relevant contours of Michigan property and nuisance law. Third, defendant must connect the state law to the facts of this case to show, for example, that the exercise of plaintiff's claimed property rights would be a nuisance and that actions by the government of which plaintiff complains are actions that could be taken under Michigan law to abate the nuisance.

60 Fed.Cl. at 240. After completing this analysis, if the court finds plaintiff possesses a property interest, then the court must determine whether that interest was taken. *See Skip Kirchdorfer,* 6 F.3d at 1582 ("To recover under the Takings Clause, a claimant with a recognized property interest must show that its interest was 'taken.' "). The court turns first to the question of whether plaintiff possesses a property interest.

## A. Whether Plaintiff Possesses a Compensable Property Interest

Federal courts look to state law to "define the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments." *Lucas,* 505 U.S. at 1030, 112 S.Ct. 2886; *see also McKay v. United States,* 199 F.3d 1376, 1381 (Fed.Cir. 1999) ("The trial court was correct to look to [state] law to determine if . . . there was a property right that could be violated, since the Fifth Amendment protects rather than creates property interests."). Plaintiff argues that plaintiff's leasehold is an interest in real property. Pl.'s Br. at 4. Defendant argues that because, at the time of the alleged taking, plaintiff did not possess the necessary Metamora Township permits to mine in the AIC as required by its Lease and because mining would be illegal anywhere on the property, plaintiff does not have a valid property right. Def.'s Br. at 23, 29.

### 1. Accrual Date of Taking Claim

Before determining whether plaintiff possesses a property interest under Michigan law, however, the court must first determine when plaintiff's taking claim first accrued because the scope of plaintiff's property interest is determined at the moment prior to that date.[6] Although the parties agree that

---

5. In a prior opinion in this case, the court decided that the *Lucas* "background principles" exception to takings liability applies to physical takings as well as to regulatory takings. *See John R. Sand II,* 60 Fed.Cl. at 235 ("The court finds that the better-reasoned position is that the background principles exception to takings liability discussed in *Lucas* can apply to both regulatory and physical takings cases."). "Because *Lucas* was a regulatory takings case, plaintiff and defendant dispute[d] whether the 'background principles' exception to takings liability applie[d] to physical takings as well as to regulatory takings." *Id.* (citation omitted); *see also Lucas,* 505

U.S. at 1009, 112 S.Ct. 2886 (stating that plaintiff alleged a taking based on the state's passage of the Beachfront Management Act).

6. In the court's prior summary judgment opinions, the court left open the question of when plaintiff's taking claim first accrued. *See John R. Sand II,* 60 Fed.Cl. at 241 (treating plaintiff's taking claim as having accrued on January 8, 1997 only "[f]or the purpose of considering the pending motions"); *John R. Sand I,* 57 Fed.Cl. at 193 (finding plaintiff's claim not to be time-barred and stating that "[t]he court need not now

plaintiff's taking claim accrued in May 1998, *see* Plaintiff's Brief Concerning [Expert Opinion Testimony and Accrual Date] at 7 (arguing that May 1998 is the date when plaintiff was completely and permanently excluded from the AIC); Defendant's Special Briefing in Response to the Court's Order of July 7, 2004, at 3 ("[I]t appears that it was not until May 1998 … that plaintiff was clearly and permanently excluded from the AIC."), the date of first accrual of a takings claim is a matter of law, *see Banks v. United States,* 314 F.3d 1304, 1307–08 (Fed.Cir.2003) (stating that the appellate court reviews matters of law de novo and applying that standard to the trial court's decision to dismiss a takings claim as time-barred, which requires analysis of when the claim first accrued).

The Supreme Court has stated that, in the case of a physical taking, the act of the government entering into possession of the property constitutes the act of taking. *United States v. Dow,* 357 U.S. 17, 22, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). The Court has also stated that "when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). A physical occupation is "a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property." *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1353 (Fed.Cir.2002). The date on which a property interest is "clearly and permanently taken" is the "key date for accrual purposes." *Boling v. United States,* 220 F.3d 1365, 1370 (Fed.Cir.2000). Thus, plaintiff's taking claim first accrued when it became clear that the government was permanently and exclusively occupying the portion of plaintiff's leasehold alleged to have been taken.

The court finds that plaintiff's taking claim accrued in May of 1998, when defendant's agents completed relocation of a perimeter fence around the AIC. *See* JX 25 (Letter from Campbell to Haynes of 5/12/98, stating that "relocation of sections of the Site security fence has been completed"). Prior to that time, ongoing access disputes prevented defendant from permanently and exclusively occupying the AIC.[7] The government's action, through its representatives, in completing the fence relocation in May 1998 extinguished plaintiff's right to possess, use, and dispose of its property interest. *See Loretto,* 458 U.S. at 435, 102 S.Ct. 3164 ("Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'" (quoting *United States v. Gen. Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945))). The May 1998 fence permanently and absolutely excluded plaintiff from the AIC. *See* Stip. Facts ¶ 20 (stating that the May 1998 fence "completely excluded plaintiff from the [AIC]"); *see also Loretto,* 458 U.S. at 435 n. 12, 102 S.Ct. 3164 (stating that "[t]he permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude"). Because plaintiff's taking claim accrued in May 1998, it is as of this date that the court evaluates the scope of plaintiff's property interest.

decide exactly when plaintiff's claim first accrued").

7. Plaintiff's denial of access to defendant's representatives on two occasions in 1996 led the EPA to issue an administrative access order in December of 1996, which prohibited plaintiff from interfering with the AIC. JX 45 (Administrative Order Directing Compliance with Request for Access in *In re Metamora Landfill Site,* No. 97–C–379 ¶¶ 4(n), 6(g) (EPA Dec. 18, 1996)). Despite this order, plaintiff continued to interfere with site access. *See, e.g.,* DX 169 (Letter from Longo to Haynes of 1/29/97, at 1, stating that "due to your client's [John R. Sand's] refusal to allow access, the [Metamora Landfill Settling Potentially Responsible Party Group (MLSPG)] was forced to suspend activities at the site"). In 1997, defendant filed a complaint in the District Court for the Eastern District of Michigan, seeking an order in aid of access to the Metamora Landfill site. *See* JX 24 (*United States v. John R. Sand & Gravel Co.,* No. 97–75497, at 1 (E.D.Mich. Mar. 23, 1998)). On March 23, 1998, the court granted the government and its representatives access to the Metamora Landfill site and authorized relocation of the AIC perimeter fencing. *See* JX 24 (*United States v. John R. Sand & Gravel Co.,* No. 97–75497, at 2–3 (E.D.Mich. Mar. 23, 1998)). Relocation of the perimeter fence was completed in May of 1998. *See* JX 25 (Letter from Campbell to Haynes of 5/12/98, stating that "relocation of sections of the Site security fence has been completed").

2. Whether Plaintiff Complied with Lease

Plaintiff's claimed property interest arises from its Lease.

The Lease of approximately 158 acres of land in Lapeer County, Michigan for a term of fifty years (from August 1, 1969). *See* JX 1 (Lease ¶¶ 1–2); Tr. at 362:8–10 (Testimony of Mr. Evatz regarding the size of the leasehold estate). The lessors own the property in fee simple absolute. *See* JX 1 (Lease ¶ 5, stating, "The parties of the first part covenant and warrant that they are the owners of the above described premises in fee simple and absolute . . . .").[8] The land was

> leased to the exclusive use of [John R. Sand] for the purpose of stripping the land, taking out and removing therefrom the marketable stone and sand, which is, or which may hereafter be found on, in or under said land, together with the right to construct or build, and to make all excavations, pits openings, ditches, roadways and other improvements upon the said premises, which are or may become necessary or suitable for removing sand and stone from the said premises.

JX 1 (Lease ¶ 1). Paragraph seven of the Lease provides that John R. Sand "agrees to operate its mining operations according to the Zoning Ordinance for the Township of Metamora and according to all conditions as required in a Gravel and Sand Mining Permit as issued by the Township of Metamora, Lapeer County, Michigan." JX 1 (Lease ¶ 7). Paragraph nine of the Lease provides for automatic cancellation of the Lease "should [John R. Sand] fail to remove any sand or stone from the premises and fail to make payment . . . for a twelve (12) month period." JX 1 (Lease ¶ 9).

■ Under Michigan law, "a leasehold and rights derived from a leasehold[ ] constitute 'property,' for the taking of which just compensation must be made or secured." *Lookholder v. Ziegler*, 354 Mich. 28, 91 N.W.2d 834, 838 (1958) (citations omitted); *see also United Coin Meter Co. v. Gibson*, 109 Mich.App. 652, 311 N.W.2d 442, 444 (1981) (stating that a lease agreement transfers to the tenant a possessory estate (citing

*Nowlin Lumber Co. v. Wilson*, 119 Mich. 406, 78 N.W. 338 (1899))). "A lease . . . gives the tenant possession of the property leased and exclusive use or occupation of it for all purposes not prohibited by the terms of the lease." *United Coin Meter Co.*, 311 N.W.2d at 444. Additionally, unsevered sand and gravel is real estate. *See Rolland Township v. Pakes*, 226 Mich. 284, 197 N.W. 525, 526–27 (1924) (reporting the finding of the circuit judge that "gravel in a pit unremoved is real estate" and later stating that "[w]hen the gravel was severed and removed, it was not real estate"). Because plaintiff possesses a property interest recognized under Michigan law and because " '[e]very sort of [real property] interest the citizen may possess' counts as a property interest under the Fifth Amendment," *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed.Cir.2003) (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)), the court finds that plaintiff possesses a type of property interest that is compensable under the Fifth Amendment.

■ Defendant argues, however, that the Lease is no longer in effect because plaintiff failed to comply with it. The parties agree that paragraph nine of the Lease requires plaintiff either to remove sand or stone or to pay royalties at least once per year. *See* Defendant's Post–Trial Reply Memorandum (Def.'s Resp. Br.) at 29 ("Paragraph 9 of the lease requires that John R. Sand remove sand or stone from the premises or pay royalties at least once a year."); Pl.'s Br. at 7 n. 3 ("[T]he lease will *not* be cancelled if plaintiff removes sand or stone *or* pays royalties."). The court agrees with the parties' interpretation of paragraph nine. The parties disagree about whether plaintiff has complied with the requirements of paragraph nine. *Compare* Def.'s Resp. Br. at 29 (arguing that the "evidence does not demonstrate" that plaintiff has complied with paragraph nine) *with* Pl.'s Br. at 7 ("[P]laintiff has fulfilled its lease obligations to either remove sand or stone from the leasehold or pay the landlord."). The 1992–1993 time frame is the focus of this dispute. *See* Def.'s Resp. Br. at 30 (referring to plaintiff's 1992 and 1993 cor-

---

8. The Estate of Russell Parrish now owns the property. Stip. Facts ¶ 2.

porate filings and Mr. Evatz's visit to the leasehold site in 1992); Pl.'s Br. at 7 & n. 4 (same).

The parties have pointed to three types of evidence that bear on the question of whether plaintiff has complied with paragraph nine of its Lease. Plaintiff points to plaintiff's yardage book (Yardage Book). Pl.'s Br. at 7. Defendant points to witness testimony regarding visits to the leasehold site in the early 1990s and to plaintiff's 1992 and 1993 corporate filings. Def.'s Resp. Br. at 29–30.

Plaintiff's president, Mr. Evatz, testified that the Yardage Book "keeps track of the yardage of material that we sell, so that we can pay Parrish's royalty." Tr. at 496:21–23. The Yardage Book covers the 1981–2004 time period. Tr. at 497:2–4 (Testimony of Mr. Evatz); see also Plaintiff's Exhibit (PX) 50 (Yardage Book). Plaintiff argues that plaintiff's Yardage Book is the "best evidence of its operations." Pl.'s Br. at 7 n. 4. Defendant disagrees and attacks the reliability of the Yardage Book by pointing to Mr. Evatz's testimony. Def.'s Resp. Br. at 29–30. Defendant first draws the court's attention to Mr. Evatz's testimony that he removed two yards of "gravel" in August of 1992. Def.'s Resp. Br. at 30; see also Tr. at 390:21–22, 504:4–5 (testimony of Mr. Evatz, stating that he removed two cubic yards of gravel). Defendant points out that the Yardage Book indicates that two cubic yards of sand, not gravel, were removed. Def.'s Resp. Br. at 30; see also PX 50, at 20215 (Yardage Book, reflecting that the "2" entry for August 5, 1992 appears in the "Sand" column). However, Mr. Evatz explained that the only product that is recorded in the "Stone" column in the Yardage Book is "6A," which is used for making concrete. Tr. at 504:6–9. The column labeled "Sand" is for all other products, such as sand, pea pebbles and 60/40 road gravel. Tr. at 504:10–11. Mr. Evatz further explained that the royalty agreement dictated this division. Tr. at 504:7–12. Paragraph three of the Lease states that John R. Sand & Gravel Company is to pay the Parrishes "ten cents (.10¢) per yard for the sand and pea pebbles and (15¢) per yard for the stone." JX 1 (Lease ¶ 3). The court credits Mr. Evatz's explanation of the apparent discrepancy between his testimony and the Yardage Book and does not view the discrepancy as impugning the reliability of the Yardage Book.

Second, defendant argues that the two payments indicated in the Yardage Book for the August 1992 period "appear to be in different handwriting[,][y]et, Mr. Evatz testified that he made the August 1992 entry himself." Def.'s Resp. Br. at 30; see also Tr. at 508:2–11 (testimony of Mr. Evatz stating that he made the entries in the Yardage Book). Defendant presented no trial testimony regarding whether the entries for the August 1992 payments were in the same handwriting. Defense counsel is neither an expert qualified to opine regarding handwriting nor a lay person familiar with Mr. Evatz's handwriting. Cf. United States v. Mooney, 315 F.3d 54, 61–63 (1st Cir.2002) (upholding the district court's decision to admit the testimony of a handwriting expert under Federal Rule of Evidence 702); United States v. Barker, 735 F.2d 1280, 1283 (11th Cir.1984) (upholding the district court's decision to admit the testimony of two lay witnesses who were familiar with defendant's handwriting regarding their opinion of whether defendant's handwriting appeared on traveler's checks under Federal Rules of Evidence 701 and 901(b)(2)). The court does not find that defendant's unsupported assertion provides any reason to question the reliability of plaintiff's Yardage Book.

Third, defendant points to certain extrinsic evidence—site visits in the early 1990s and corporate filings—to assail the reliability of plaintiff's Yardage Book. Def.'s Resp. Br. at 29–30. Two witnesses testified that when they visited the Metamora Landfill site in the early 1990s the mining operation was inactive. See Tr. at 201:13–18 (Testimony of Dr. Campbell, stating that when he visited the site in the spring of 1992, he "didn't see any signs of activity"); Tr. at 1020:14–22, 1031:3–8 (Testimony of Mr. Turchan, stating that when he visited the site in April 1990, his "initial impression was that it was an inactive [mining] operation"). Plaintiff's 1992 and 1993 corporate filings characterize plaintiff's business as an "inactive" sand and gravel pit. DX 14, at 000012, 000014. The court does

not find the testimony of the site visitors or the statement in corporate filings to be dispositive with respect to whether plaintiff removed sand or gravel or paid royalties within any given twelve-month period. The payment of royalties could occur even if a mining operation were inactive. The Lease does not specify what quantity of sand or gravel had to be removed from the premises. A small amount of sand or gravel could have been removed from the premises without activating the mining operation. And, in fact, the testimony of plaintiff's president supports this conclusion. Mr. Evatz testified that when he became president of John R. Sand in 1992, he went to the leasehold site and removed and sold two yards of sand to keep the Lease open. Tr. at 355:24–356:1, 390:18–22. He testified that he recorded this transaction in the Yardage Book. Tr. at 504:13–21, 508:10–11; PX 50, at 20215 (Yardage Book).

Because the court credits plaintiff's testimony with respect to the removal and sale of sand in 1992, the court finds, consistent with the business record contained in the Yardage Book, that plaintiff's Lease was not terminated by non-compliance with the obligation to mine or pay royalties. *See* Def.'s Resp. Br. at 29 (acknowledging that "the Yardage Book appears to contain entries suggesting that plaintiff fulfilled the requirements of ¶ 9"); Pl.'s Br. at 7 (arguing that testimony demonstrates that "plaintiff has fulfilled its lease obligations to either remove sand or stone from the leasehold or pay the landlord").

3. Whether State and Local Mining Permits are Necessary to Establish Property Interest

Defendant argues that, in May 1998, plaintiff was not in compliance with Metamora Township zoning ordinances, did not possess a permit to mine from Metamora Township, did not possess a Soil Erosion and Sedimentation Control permit from Lapeer County, did not possess a groundwater discharge permit from the state of Michigan, Def.'s Br. at 23–34, and that plaintiff's "lack of state and local permits renders its property interest uncompensable," Def.'s Resp. Br. at 32 (emphasis omitted). This is because plaintiff's Lease grants it only the right to mine sand and gravel. Def.'s Br. at 23; JX 1 (Lease ¶ 1). Defendant's argument is that if, under state and local law, plaintiff cannot mine sand and gravel, then the government, by excluding plaintiff from the AIC, has not taken anything from plaintiff. *See* Def.'s Br. at 29 ("John R. Sand does not [possess] the necessary local permission to undertake the use of its property—mining in the AIC—that it complains has been taken. Accordingly, [p]laintiff's exclusion [from] the AIC has not deprived it of a right otherwise enjoyed under the terms of its lease.").

Defendant cites a number of cases to support its argument. Def.'s Br. at 29 (citing *United States v. Hill,* 896 F.Supp. 1057 (D.Colo.1995); *City Nat'l Bank v. United States,* 33 Fed.Cl. 224 (1995); *Plantation Landing Resort, Inc. v. United States,* 30 Fed.Cl. 63 (1993)); Def.'s Resp. Br. at 31 (citing *United States v. Willow River Power Co.,* 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945)). Plaintiff argues that these cases "deal with instances where the plaintiff could only obtain its property interest via the permit in question." Plaintiff's Response to Defendant's Post Trial Memorandum (Pl.'s Resp. Br.) at 8. The court finds the *City National Bank* case most closely analogous to the present facts.

In *City National Bank,* the court stated that the issue before it was "whether a landowner seeking damages for a taking of his property must take into account existing state and county regulatory restrictions concerning limerock mining when valuing the property prior to the date on which the [federal government] denied a permit necessary to develop the property for mining." 33 Fed.Cl. at 225. The court noted that the plaintiff possessed a "compensable property interest." *Id.* at 232 n. 12. The court did not reach a conclusion on the issue of valuation and stated that if the defendant could establish that the plaintiff could not obtain a permit to mine limerock, "plaintiff's takings claim must fail, because there would be no diminution in the value of the property as of the date of the alleged taking attributable to actions of the Federal Government." 33 Fed.Cl. at 233. In the court's next decision in *City National Bank,* the court found that,

"prior to the [federal government's] permit denial, plaintiff could not mine limerock." *City Nat'l Bank v. United States,* 33 Fed.Cl. 759, 764 (1995). Thus, the federal government's denial of the permit, "which admittedly disabled plaintiff from mining limerock, did not affect the value of the property." *Id.* The court granted defendant's motion for summary judgment because "ruling that plaintiff cannot establish the value of his property for mining limerock as of the date of taking forecloses any monetary recovery." *Id.* at 764 n. 5. The court's discussion of the effect of local regulations, and specifically plaintiff's inability to mine limerock under local regulations, on plaintiff's taking claim pertained only to the valuation of plaintiff's property interest. *See id.* ("The court notes that this order solely addresses the issue of valuation.").

The other cases cited by defendant address whether the claimant possessed a property interest. In *Willow River Power Co.,* the Supreme Court stated that the issue before the court was whether a property right existed. *See* 324 U.S. at 502–03, 65 S.Ct. 761 ("We cannot start the process of decision by calling such a claim as we have here a 'property right'; whether it is a property right is really the question to be answered."). In holding that no property right existed, the Court stated that "not all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them." *Id.* at 502, 511, 65 S.Ct. 761.

In *Plantation Landing Resort,* the court found that, because the plaintiff did not possess a "compensable interest" with respect to land below the mean high water mark, it could not proceed with a takings claim with respect to that land. 30 Fed.Cl. at 68. Defendant here reads the requirement that a claimant have a "compensable property interest" into the court's statement that, "[b]y not renewing the permit, plaintiff extinguished its compensable interest." *See* Def.'s Br. at 29 (quoting *Plantation Landing Resort* as support for the proposition that "a plaintiff must establish the existence of a compensable property interest"). The court's discussion, the facts of the case, and Louisiana law

demonstrate, however, that the court required that plaintiff possess a property interest, not a "compensable property interest."

In setting out the legal standard for a takings claim, the court in *Plantation Landing Resort* stated that "[b]efore a party can recover just compensation under the Fifth Amendment for a taking ... it must establish a compensable property interest." 30 Fed.Cl. at 67. The next sentence of the court's opinion reads, " '[I]t is clear that only the owner of the property at the time of the taking is entitled to be compensated for the taking.' " *Id.* (quoting *Lacey v. United States,* 219 Ct.Cl. 551, 595 F.2d 614, 619 (1979)). The court thus equated a "compensable property interest" with property ownership and found that the plaintiff did not own the property alleged to have been taken. Under Louisiana law, it appears that title to land passes to the state when the land erodes and navigable water covers it. *See* La. Civ. Code Ann. art. 450 (West 1980) ("Public things that belong to the state are ... bottoms of natural navigable water bodies ...."); La.Rev.Stat. Ann. § 9:1151 (West 2004) (referring to a "change" in "ownership" of land or water bottoms as a result of water changing its course or eroding land and setting out the obligation of the "new owner," including the state of Louisiana, with respect to already existing mineral leases). The original landowner may reclaim the land by obtaining a permit to do so. La.Rev.Stat. Ann. § 41:1702 (West 2004). Thus, in *Plantation Landing Resort,* the state owned the property alleged to have been taken and the plaintiff had no property interest in that land.

In *Hill,* the court concluded that because the plaintiff "had no arguably vested property right to sell the animal parts when he received them[,] ... he has lost no right for which he can claim he is owed compensation." 896 F.Supp. at 1063. The court noted that the plaintiff could have sold the animal parts if he had obtained a permit. *Id.* Had plaintiff possessed a permit, he would have had a vested property right to sell the animal parts. However, plaintiff's lack of a permit precluded a finding that the plaintiff possessed a property interest.

The court believes that, in this case, defendant's argument regarding plaintiff's possession, or lack thereof, of state and local permission to mine is best characterized as a damages argument. Indeed, in defendant's post-trial response brief, defendant clarified that it is not arguing that plaintiff's property interest has been voided by the lack of permits (or that plaintiff's Lease has been breached), but that the lack of permits renders plaintiff's property interest uncompensable. Def.'s Resp. Br. at 31–32. The trial, and this opinion, are limited to the issue of liability.

### 4. Whether Plaintiff's Lease is Subject to the Landfill

Defendant argues that "plaintiff acquired its property interest subject to the landfill," and, "to the extent the landfill now prevents plaintiff from mining sand and gravel in the AIC, plaintiff has consented to that restriction on its property interest." Def.'s Br. at 34. Defendant states that the Landfill was in existence when plaintiff acquired the Lease and that the Landfill and plaintiff's sand and gravel mining operations were coordinated enterprises. *Id.* at 34–36. Defendant contends, based on plaintiff's acquiescence to the deposition of refuse on a portion of plaintiff's leasehold, that plaintiff "allowed a nuisance to be created upon its own property" and "allowed the nuisance to continue and to grow on sand and gravel over which [plaintiff] had possession and control." *Id.* at 37.[9] Defendant argues that plaintiff's conduct contributed to plaintiff's loss of sand and gravel, estops plaintiff from claiming a taking and waives plaintiff's right to object to state-imposed restrictions on the closure of municipal landfills. *Id.* at 40–41.

This argument appears to be presented for the first time in defendant's post-trial briefing. Although plaintiff raised no objection to defendant's argument, the court addresses the propriety of raising a new legal argument in post-trial briefing. Rule 15(b) of the Rules of the United States Court of Federal Claims states:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

RCFC 15(b). Rule 15(b) is to be "liberally construed." *Tucker v. United States,* 8 Cl. Ct. 575, 586 (1985); *see also Laningham v. United States,* 5 Cl.Ct. 146, 156 (1984) ("The courts have generally accorded Rule 15(b) a liberal construction, so as to enable controversies to be tried on the merits."). "[A]n absolute minimum requirement before Rule 15(b) can be invoked after trial has been that evidence must have been introduced at trial pertaining to the factual issue(s) implicit in the new claim." *Laningham,* 5 Cl.Ct. at 156. This court's predecessor has found that the substantially similar prior version of Rule 15(b) "allow[ed] the court to treat the pleadings as though amended in order to conform to the proof" where a defense was not affirmatively plead, a procedure preferred by the prior version of Rule 8(c), but was "effectively tried with mutual consent of the parties." *Technical Dev. Corp. v. United States,* 202 Ct.Cl. 237, 243, 1973 WL 21347 (1973); *see* RCFC 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively ... estoppel, ... waiver, and any other matter constituting an avoidance or affirmative defense.").

The court finds that the defense that plaintiff acquired its Lease subject to the Landfill was tried by the implied consent of the parties. Evidence regarding the factual predicate of the defense was presented at trial. Defendant's failure to make a motion to amend its pleadings to conform to the evidence does not affect the result of the trial on this issue.

Plaintiff contests each of defendant's arguments. Pl.'s Resp. Br. at 16–19. Plaintiff's primary argument is that plaintiff did not

---

9. The court examines certain aspects of defendant's nuisance-related argument in the section addressing background principles of Michigan law. *See infra* Part II.B.

know that hazardous material was being dumped at the Landfill and "[m]ere knowledge that waste of some kind is deposited in the landfill does not rise to perpetrating or allowing a continuing nuisance." Pl.'s Resp. Br. at 19. Plaintiff states that "at no time did plaintiff have any control or ownership interest in the landfill operation" and that its Lease "did not grant any rights or responsibilities in the landfill operation." *Id.* at 18–19. Plaintiff adds that "even if plaintiff had some knowledge of hazardous materials being deposited at a landfill it has no control over, defendant has not cited any law to suggest that this knowledge somehow acts to waive plaintiff's constitutional rights." *Id.* at 19. Plaintiff also argues that it did not participate in the Landfill operation. *Id.* at 16.

While the court heard the testimony of thirteen witnesses, it was the testimony of Edward W. Evatz, Jr., the current president of John R. Sand & Gravel Company, Tr. at 355:8–356:1, that proved to be the most illuminating on the issue of plaintiff's relation to the Landfill. Mr. Evatz testified that when the Lease was entered into, in 1969, the Landfill already existed on the leasehold property, Tr. at 469:13–17, and that, at that time, his father was aware of the Landfill operation, Tr. at 470:4–7. Additionally, when Mr. Evatz was first on the leasehold property in 1970, Tr. at 468:3–4, he was aware of the Landfill operation because his father had told him about it, Tr. at 470:8–17.

Although Mr. Evatz testified that there were no informal agreements between John R. Sand and Russell Parrish, Tr. at 470:18–25, the evidence indicates that John R. Sand and the Landfill operation cooperated with each other. Mr. Evatz testified that both Russell Parrish and Eugene Parrish, his son, Tr. at 471:17, alerted Mr. Evatz to areas of the Landfill property that might be good for sand and gravel mining. Tr. at 471:2–8. When so alerted, Mr. Evatz would send John R. Sand's trucks to the area indicated and the Parrish operation would load John R. Sand's trucks with the sand and gravel. Tr. at 471:10–15.

This mutually beneficial arrangement is characterized by Mr. Evatz's testimony that "on different occasions" Mr. Parrish "would come by and say, hey, we found some ... good gravel, you want me to load your trucks up? And I'd say, sure. So we'd send the trucks back to wherever he found it, and they'd load the trucks up and that'd free up a crane operator." Tr. at 471:10–15. Specifically, Mr. Evatz agreed that this arrangement was a "good deal" because it "freed up [a crane] operator" for plaintiff. Tr. at 478:1–8. Mr. Evatz testified that from 1972–1976, John R. Sand was mining to the east of the Landfill, Tr. at 373:15–21, 477:14–478:1; *see also* PX 59 (Map indicating locations and time frames of John R. Sand's mining activities), and that the goal was to get the gravel to the east of the Landfill out of the ground before the Landfill expanded to the eastern lot line, Tr. at 375:3–8, 478:1–3. As John R. Sand dug out the gravel to the east of the Landfill, the Landfill operators "could just dump the garbage in the hole that [John R. Sand] produced." Tr. at 375:3–8. Mr. Evatz further testified that, in 1974, John R. Sand mined sand and gravel in an area that was "near or ... in" an area that later became a drum disposal area. Tr. at 551:19–552:18; PX 59 (Map indicating locations and time frames of John R. Sand's mining activities).

Plaintiff allowed the Landfill operation to continue on plaintiff's leasehold despite plaintiff's own understanding of its Lease that John R. Sand was "allowed to mine the entire property," Tr. at 364:4–8, and that John R. Sand's right to mine the property is exclusive in that it would preclude any other uses of the property, Tr. at 365:1–13. Plaintiff, in fact, successfully asserted this understanding of the Lease in litigation with County Transfer Stations, Inc. County Transfer Stations sued John R. Sand for interfering with its business. *County Transfer Stations, Inc. v. John R. Sand & Gravel Co.*, No. 236611, 2003 WL 22495581, at *2 (Mich.Ct.App. Nov.4, 2003). The Michigan court found that County Transfer Stations' "use and ownership of its property was clearly subject to [John R. Sand's] mining lease." *Id.* at *3. The court further stated that John R. Sand had no obligation to accommodate County Transfer Stations' business. *Id.* John R. Sand, likewise, had no obligation to accommodate the Metamora Landfill operation, yet the evi-

dence clearly shows that it did so. John R. Sand both allowed the Landfill to operate on the northern portion of its leasehold property and cooperated with the Landfill operation to its own benefit.

Mr. Evatz testified that he saw trucks dumping barrels into the Landfill on two occasions in the 1970s. Tr. at 479:22–480:13, 1362:21–1363:3. When the state began investigating the drums, Mr. Evatz met with Lt. Gregory Eagle and pointed out areas where drums had been buried. Tr. at 483:9–17 (Testimony of Mr. Evatz). The Michigan Department of Natural Resources [10] estimated that "as many as 35,800 drums could be buried" at the site. DX 71 (Magnetometer Survey, *supra*, at 6). These drums were buried on the site from approximately 1966 to the mid- to late–1970s. *See* DX 103, at 0039780–81, 0039806 (Parrish Deposition, *supra*, stating that the Landfill began accepting drums in 1966 and accepted them until Eugene Parrish took control of the facility in 1974). Mr. Evatz testified that between 1970 and 1985 he was at the leasehold site on a daily basis. Tr. at 379:16–23; *see also* Tr. at 1364:19–22 (Testimony of Mr. Evatz, stating that he was at the leasehold site "[m]ost of the time" in the 1970–1985 time period). Mr. Evatz was thus at the leasehold site on a daily basis for approximately four of the approximately eight years when drums were being buried at the site. Having had the opportunity to observe the demeanor of Mr. Evatz and, given his testimony demonstrating his subsequent ability to identify areas where drums were buried, Tr. at 483:16–17, the court finds that it strains credulity that Mr. Evatz observed trucks dumping barrels on only the two occasions to which he testified. Whether Mr. Evatz observed the dumping of barrels once, twice, or many times, however, John R. Sand's regular cooperation in activities to develop the Landfill provides a sufficient basis for charging plaintiff with knowledge of, acquiescence in, and cooperation with an activity occurring on its leasehold that could potentially interfere with its leasehold rights.

Plaintiff acquired its Lease with full knowledge that a landfill existed on the northern portion of its leasehold. Plaintiff's sand and gravel mining business cooperated with the Landfill operation. Under plaintiff's Lease, plaintiff could have shut down the Landfill operation at any time, but did not do so.

Defendant cites *Chancellor Manor v. United States*, 331 F.3d 891, 905 (Fed.Cir. 2003), and *Texaco, Inc. v. Short*, 454 U.S. 516, 530, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982), to support the proposition that "[p]laintiff should [be] barred from seeking compensation for 'lost' sand and gravel when [plaintiff's] own conduct, both directly and indirectly, contributed to the loss of that sand and gravel." Def.'s Br. at 40. *Chancellor Manor* was a regulatory taking case in which the Federal Circuit applied the analysis of *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). *Chancellor Manor*, 331 F.3d at 901, 903. Plaintiffs argued that they did not cause the problem that the legislation that was the alleged source of the taking sought to address, so it would be unfair for them to bear the burden of solving the problem. *Id.* at 905. Although the court did not have a sufficient record before it to render a decision on this issue, the court did state that "it is pertinent whether the party seeking compensation has created or contributed to the problem the government seeks to solve." *Id.* While *Chancellor Manor* was a regulatory takings case, the court's comment regarding whether the party seeking compensation created or contributed to the problem addressed by the regulation occurred in a larger discussion of the character of the government action factor of the *Penn Central* analysis. *Id.* at 904–05. In a physical takings case, " 'the character of the government action' not only is an important factor in resolving whether the action works a taking but also is determinative." *Loretto*, 458 U.S. at 426, 102 S.Ct. 3164. Thus, in a physical takings case, whether the party seeking compensation has created or contributed to the problem the government seeks to solve by physically occupying the

---

**10.** The Michigan Department of Natural Resources is now called the Michigan Department of Environmental Quality. Tr. at 858:23–859:8 (Testimony of Mr. Henry).

claimant's property is relevant to the takings analysis. In this case, John R. Sand's own actions (allowing the Landfill operation to continue on its property and cooperating with the Landfill operation) contributed to the problem (a landfill encompassing a hazardous waste site) that the government sought to solve by remediating the site and, in the process of remediation, excluding plaintiff from a portion of its leasehold.[11]

In addition to *Chancellor Manor*, two Federal Circuit cases in which property was taken during the investigation and remediation of a hazardous waste site are instructive by contrast. In *Hendler v. United States*, owners of property near a hazardous waste site brought a takings claim against the federal government for the installation and monitoring of groundwater monitoring wells on their property. 952 F.2d 1364, 1369–70 (Fed.Cir.1991). The Federal Circuit held that the government physically took the owners' property. *Id.* at 1377. There is no indication in any of the trial court or appellate court decisions that the property owners contributed in any way to the creation of the hazardous waste site. *See, e.g., Hendler v. United States*, 175 F.3d 1374, 1383 (Fed.Cir.1999) (stating that the owners of the hazardous site, the State of California and users of the site were held liable for clean-up costs); *Hendler v. United States*, 36 Fed.Cl. 574, 576–77 (1996) (stating that the *Hendler* owners first acquired the neighboring property in 1960 and "planned to hold the property until economic conditions favored commercial development"). *McKay v. United States*, 199 F.3d 1376 (Fed.Cir.1999), is "factually similar" to *Hendler*. 199 F.3d at 1381. In *McKay*, the plaintiffs owned a mineral estate and the government owned the overlying surface rights. *Id.* at 1378. The overlying estate was designated a "Hazardous Substance Site" and the government installed groundwater monitoring wells that extended into the plaintiffs' mineral estate without the plaintiffs' consent. *Id.* The Federal Circuit found that the trial court's granting of "summary judgment for the [g]overnment of no liability was not warranted." *Id.* at 1382. As in *Hendler*, there was no indication that the plaintiffs contributed in any way to the creation of the hazardous waste site. *See id.* at 1378 (stating that the Department of Energy sprayed waste onto the overlying estate and that the Department of Energy, EPA, and the Colorado Department of Public Health and Environment entered into a consent decree to investigate and remediate the site).

In both *Hendler* and *McKay*, innocent landowners were able to recover where their land was taken in order to investigate and monitor a neighboring (*Hendler*) or contiguous overlying (*McKay*) hazardous waste site. That is not the case here. John R. Sand permitted the Landfill to exist on its own

---

11. The *Texaco* case, on which defendant also relies, is a regulatory takings case in which the Supreme Court examined a takings challenge to an Indiana statute that provided that "a severed mineral interest that is not used for a period of 20 years automatically lapses and reverts to the current surface owner of the property, unless the mineral owner files a statement of claim in the local county recorder's office." 454 U.S. at 518, 102 S.Ct. 781. In holding that the statute did not take private property without just compensation, the Court stated,

In ruling that private property may be deemed to be abandoned and to lapse upon the failure of its owner to take reasonable actions imposed by law, this Court has never required [the government] to compensate the owner for the consequences of his own neglect. We have concluded that the [government] may treat a mineral interest that has not been used for 20 years and for which no statement of claim has been filed as abandoned; it follows that, after abandonment, the former owner retains no

interest for which he may claim compensation. It is the owner's failure to make any use of the property-and not the action of the [government]-that causes the lapse of the property right; there is no "taking" that requires compensation. The requirement that an owner of a property interest that has not been used for 20 years must come forward and file a current statement of claim is not itself a "taking."

*Id.* at 530, 102 S.Ct. 781. Defendant focuses on the portion of the passage that states, "[T]his Court has never required [the government] to compensate the owner for the consequences of his own neglect." Def.'s Br. at 40. The Supreme Court found that a property owner's "neglect" in failing to follow a constitutional regulatory scheme, which required an owner to use property or file a claim, caused the owner to lose its property interest. In the present case, there is no scheme or government action that divests plaintiff of its property interest. The court views *Texaco* as distinguishable from the present case and inapplicable to the facts before it.

leasehold, coordinated landfilling activities with the Landfill operators, and observed barrels containing hazardous materials being dumped on the leasehold property. Even if, as plaintiff argues in post-trial briefing but did not directly testify to, plaintiff did not know that the barrels contained hazardous materials, Pl.'s Resp. Br. at 19 (citing Mr. Evatz' testimony that he "couldn't see what was inside [drums being dumped on the leasehold]," Tr. at 480:4–6), plaintiff's participation in the Landfill operation and acquiescence in its presence on its leasehold preclude a finding that plaintiff is an innocent landowner in the position of the plaintiffs in *Hendler* and *McKay*. Had the plaintiffs in *Hendler* and *McKay* not prevailed, they would have been forced to bear a burden that was neither created nor acquiesced in by them. Here, if plaintiff prevails, plaintiff would shift a burden that plaintiff participated in creating onto the public as a whole.

Justice and fairness do not require that the community at large bear the burden of plaintiff's inability to mine a portion of its leasehold when plaintiff contributed to the circumstances causing the loss of the right to mine. In *Agins v. Tiburon*, the Supreme Court stated that "[t]he determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). The Supreme Court has also stated that the Takings Clause was "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49, 80 S.Ct. 1563; *see also Am. Pelagic Fishing Co.*, 379 F.3d at 1371 ("The purpose of [the Takings Clause] is to prevent 'Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" (quoting *Penn Central Transp. Co.*, 438 U.S. at 123, 98 S.Ct. 2646)). Plaintiff's contribution to the creation of a landfill containing a hazardous waste site makes the loss of a portion of plaintiff's property during the remediation of that site a burden which it is fair to allow plaintiff to bear, rather than shifting plaintiff's loss to the public as a whole. The court finds that fairness and justice do not require compensation to plaintiff in these circumstances.

While the foregoing determination that plaintiff's property interest is noncompensable under equitable principles defeats plaintiff's claim in its entirety, the court, in the interest of judicial economy and efficiency, now addresses the remaining issues disputed at trial. Those issues involve the government's defense based on background principles of state law which would bar plaintiff from mining in the AIC.

B.  Whether Background Principles of Michigan Law Prohibit Mining in the Area of Institutional Controls

"[I]f background principles of a state's nuisance and property law prohibit the uses a plaintiff intends, then no taking has occurred." *John R. Sand II*, 60 Fed.Cl. at 239. In *Lucas*, the Supreme Court treated regulations that prohibit all economically beneficial use of land similarly to physical occupations, stating:

> Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership. A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts-by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise.

505 U.S. at 1029, 112 S.Ct. 2886. Thus, the defendant in a takings case bears the burden of identifying the background principles and proving that they apply to the factual circumstances of the case. *Id.* at 1031, 112 S.Ct. 2886.

In applying the background principles exception, *Lucas* instructed that a court must look at the intended use of land and the land

in its current condition to determine whether background principles would prohibit the intended use. *See* 505 U.S. at 1031, 112 S.Ct. 2886 ("[The defendant] must identify background principles of nuisance and property law that prohibit the *uses [the plaintiff] now intends* in the circumstances in which the property is presently found." (emphasis added)). The Court further stated that the "inquiry we require today will ordinarily entail (as the application of state nuisance law ordinarily entails) analysis of, among other things, the degree of harm to public lands and resources, or adjacent private property, posed by the claimant's proposed activities." *Id.* at 1030–31, 112 S.Ct. 2886.

Not all background principles of state law are robust enough to fit within the *Lucas* background principles exception. *See, e.g., K & K Constr., Inc. v. Dep't of Natural Res.,* 217 Mich.App. 56, 551 N.W.2d 413, 417 (1996) (finding that a state constitutional provision declaring natural resource conservation " 'to be of paramount public concern' " and "the generalized invocation of public interests in the ... Legislature's declarations in ... the Michigan Environmental Protection Act do not constitute background principles of nuisance and property law sufficient to prohibit the use of plaintiffs' land without just compensation" (citations omitted)), *rev'd on other grounds,* 456 Mich. 570, 575 N.W.2d 531 (1998).

### 1. Applicable Michigan Law

■ Common law nuisance, as defined by Michigan law, encompasses activity causing significant harm to common rights enjoyed by the public, or significant interference with rights of private property owners to the use and enjoyment of their land. A long line of Michigan cases teaches that activities proscribed by laws enacted to protect the public health, safety, and welfare are presumed to cause significant harm to the public and are thus presumed to be nuisances. Accordingly, the court next examines the background principles of Michigan nuisance law.

■ Under Michigan law, a nuisance may either be private [12] or public. To prevail under theories of either private or public nuisance, "a plaintiff must prove significant harm resulting from the defendant's unreasonable interference with the use or enjoyment of property." *City of Jackson v. Thompson–McCully Co.,* 239 Mich.App. 482, 608 N.W.2d 531, 537 (2000); *see also* Restatement (Second) of Torts § 821F (1979) ("There is liability for a nuisance only to those to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose."). Where the injury has not yet occurred, the nuisance is anticipatory. *See Thompson–McCully Co.,* 608 N.W.2d at 537 (referring to an "anticipatory nuisance" as one where the harm has not yet occurred and is only "threatened or anticipated" (internal citation omitted)). A party claiming that an anticipatory nuisance [13] exists must show that the occurrence of injury or harm is more than conjectural:

[E]quity will not enjoin an injury which is merely anticipated nor interfere where an apprehended nuisance is doubtful, contin-

---

**12.** "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Adkins v. Thomas Solvent Co.,* 440 Mich. 293, 487 N.W.2d 715, 719 (1992) (citing Restatement (Second) of Torts § 821D (1979)). The Michigan Supreme Court has stated that

an actor is subject to liability for private nuisance ... if (a) the other has property rights and privileges in respect to the use or enjoyment interfered with, (b) the invasion results in significant harm[,] (c) the actor's conduct is the legal cause of the invasion, and (d) the invasion is either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct.

*Id.,* 487 N.W.2d at 720 (citing Restatement (Second) of Torts §§ 821D–F (1979)). This opinion focuses on the public nuisances alleged.

**13.** The parties dispute whether the nuisance defendant alleges is an anticipatory nuisance, Pl.'s Br. at 17, or an ongoing nuisance, Def.'s Resp. Br. at 20. The only permitted use of the leased property is sand and gravel mining and related activities. JX 1 (Lease ¶ 1). As of May 1998, plaintiff was not mining in the area alleged to have been taken. Defendant's argument under *Lucas* must therefore be that plaintiff's proposed use would be a nuisance. The court thus applies an anticipatory nuisance standard.

gent, conjectural or problematical. A bare possibility of nuisance or a mere fear or apprehension that injury will result is not enough. On the other hand, an injunction may issue to prevent a threatened or anticipated nuisance which will necessarily result from the contemplated act, where the nuisance is a practically certain or strongly probable result or a natural or inevitable consequence.

*Falkner v. Brookfield,* 368 Mich. 17, 117 N.W.2d 125, 128 (1962); *see also Plassey v. S. Loewenstein & Son,* 330 Mich. 525, 48 N.W.2d 126, 128 (1951) (" 'Equity, as a rule, will not interfere in advance of the creation of a nuisance where the injury is doubtful or contingent, and anticipated merely from the use to which the property is to be put.' " (quoting *Briggs v. City of Grand Rapids,* 261 Mich. 11, 245 N.W. 555, 556 (1932) (internal citations omitted))); *Foster v. County of Genesee,* 329 Mich. 665, 46 N.W.2d 426, 429 (1951) (stating that evidence that a "proposed use of property may constitute a possible threatened nuisance ... do[es] not entitle plaintiffs to an injunction" because "equity will not interfere in advance of creation of nuisance, where injury is doubtful or contingent, and anticipated merely from use to which property is to be put"); *Thompson–McCully Co.,* 608 N.W.2d at 537 ("Equity will not interfere where injury from an anticipated nuisance is doubtful or contingent.").

The Michigan Supreme Court recognized in *Adkins v. Thomas Solvent Co.* that courts must balance several factors in awarding injunctive relief for anticipatory nuisances. *See* 440 Mich. 293, 487 N.W.2d 715, 725 (1992) (acknowledging "that different considerations apply to the remedies appropriate, and that injunctive relief is sometimes available when a tort is merely threatened"); *cf. Hayes–Albion v. Kuberski,* 421 Mich. 170, 364 N.W.2d 609, 617–18 (1984) (noting the importance of balancing factors for injunctions). The seriousness of the anticipated harm must be weighed against the likelihood that it will occur:

> The seriousness and imminence of the threat are ... independent of each other, since a serious harm may be only remotely likely to materialize and a trivial harm may be quite imminent. Yet the two elements must be considered together .... The more serious the impending harm, the less justification there is for taking the chances that are involved in pronouncing the harm too remote.

Restatement (Second) of Torts § 933 cmt. b (1979); *see also Hayes–Albion,* 364 N.W.2d at 618 n. 11 (citing Restatement (Second) of Torts §§ 933, 936, and 942 for guidance in the analysis of a tort remedy). The law of anticipatory nuisance does not require absolute certainty where the harm is sufficiently serious.

■ "A public nuisance is an unreasonable interference with a common right enjoyed by the general public." *Cloverleaf Car Co. v. Phillips Petroleum Co.,* 213 Mich.App. 186, 540 N.W.2d 297, 300 (1995). While Michigan law does not explicitly define what constitutes a "common right enjoyed by the general public," the language of *Cloverleaf Car Co.* mirrors the Restatement (Second) of Torts. *See* Restatement (Second) of Torts § 821B(1) (1979) ("A public nuisance is an unreasonable interference with a right common to the general public."). The Restatement (Second) of Torts defines a "public right" to be "one common to all members of the general public. It is collective in nature ...." *Id.* § 821B cmt. g.

■ Under Michigan law, "unreasonable interference" with a public right "includes conduct that (1) significantly interferes with the public's health, safety, peace, comfort, or convenience, (2) is proscribed by law, or (3) is known or should have been known by the actor to be of a continuing nature that produces a permanent or long-lasting, significant effect on these rights." *Cloverleaf Car Co.,* 540 N.W.2d at 300–301 (finding a public nuisance where gasoline spread from a tank system into groundwater). The right to be free from groundwater contamination and the right to be free from explosion and fire hazards, for example, have long been recognized as public rights under Michigan nuisance law.

■ The possibility that groundwater contamination could be a nuisance has been recognized by the Michigan courts at least

since the late 1800s. *See, e.g., Upjohn v. Bd. of Health,* 46 Mich. 542, 9 N.W. 845, 845 (1881) (considering whether the proposed use of adjacent land as a cemetery would "be detrimental to the health of the people of the village; [would] corrupt the water of their wells and render it unfit for use, and for these reasons become a public nuisance"). The Michigan Supreme Court's statement that "the pollution of groundwater pollution may constitute a public or private nuisance," *Adkins,* 487 N.W.2d at 720 (citing Restatement (Second) of Torts § 832), recognizes that the right to be free from groundwater contamination is a public right.

The Michigan Supreme Court identified fire hazards as a nuisance in *Buckeye Union Fire Insurance Co. v. Michigan*: "the very nature of the nuisance ... [of] a fire hazard" is that "sheer chance or an act of God (lightning) would convert the peril to the neighboring land into a destructive force." 383 Mich. 630, 178 N.W.2d 476, 480 (1970). The Restatement (Second) of Torts also states that "a fire hazard to one adjoining landowner may be a public nuisance because of the danger of a conflagration." Restatement (Second) of Torts § 821B cmt. g (1979). Thus the right to be free from explosion and fire hazards is also a public right under Michigan nuisance law.

The "proscribed by law" definition of public nuisance in *Cloverleaf Car Co.,* 540 N.W.2d at 300, encapsulates a long line of Michigan decisions stating that an activity may be found to be a nuisance if it violates a law. *See Att'y Gen. ex rel. Mich. Bd. of Optometry v. Peterson,* 381 Mich. 445, 164 N.W.2d 43, 53 (1969) ("At common law, acts in violation of law constitute a public nuisance.");[14] *Township of Garfield v. Young,* 348 Mich. 337, 82 N.W.2d 876, 878 (1957) (suggesting that a statute could "denominate [an] activity a nuisance *per se* "); *Mich. State Chiropractic Ass'n v. Kelley,* 79 Mich.App.

789, 262 N.W.2d 676, 677 (1977) (stating that an "unlawful activity" is a public nuisance). However, other Michigan cases state that the bare violation of a statute is not enough to declare an activity to be a nuisance. *See Adkins,* 487 N.W.2d at 725 ("Defendant's business is a lawful business, and the fact that violations of the law may have occurred on the property does not make the conduct of the business a nuisance in fact."). "[F]actual support [is] required to prove nuisance; illegal conduct alone [is] not enough." *Id.* at 725 n. 31; *see also Conway v. Gampel,* 235 Mich. 511, 209 N.W. 562, 563 (1926) (stating that, even in a case where an activity is a nuisance per se, "a court of equity requires evidence of the fact of actual nuisance before it will enjoin"). *Adkins,* however, was decided on a theory of private nuisance in which no illegal conduct was alleged. *See* 487 N.W.2d at 721 ("The crux of plaintiff's complaint is that publicity concerning the contamination of ground water in the area (although concededly not their ground water) caused diminution in the value of the plaintiff's property."). *Conway* awarded injunctive relief to private landowners on grounds of both per se and factual nuisance. *See* 209 N.W. at 563 (noting that "if plaintiffs have established right to injunctive relief on [either allegations of illegal conduct or factual nuisance], the [lower court] must be affirmed."). But where a "statute enacted to preserve public health, safety and welfare" is violated, Michigan courts apply a per se rule. *See, e.g., Peterson,* 164 N.W.2d at 53 ("Harm to the public is presumed to flow from the violation of a valid statute enacted to preserve public health, safety and welfare.").

The public health and safety laws at issue in this case are contained in the Michigan Natural Resources and Environmental Protection Act (NREPA). Mich. Comp. Laws Ann. §§ 324.101–.99904 (West 1998).[15] In

---

**14.** In the published form of this case, the dissenting opinion precedes the majority opinion. *See Peterson,* 164 N.W.2d at 44 (noting in the syllabus that Chief Justice Brennan authored the opinion, with a dissent by Justices Adams and Kavanagh, and beginning the opinion with Justice Adams' dissent). A subsequently published electronic version of the opinion, at 1969 Mich. LEXIS 139, corrects the opinion's format. The

court draws attention to this anomaly to prevent confusion and to note that its opinion relies solely on the *Peterson* majority.

**15.** The court uses the version and numbering of the law in effect in May of 1998, the date of the alleged taking, *see supra* Part II.A.1 (deciding that plaintiff's takings claim accrued in May 1998).

1995 NREPA, as explained in the Preamble to section 324.101, effectively consolidated environmental protection statutes and created the Department of Environmental Quality, with jurisdiction over enforcement of pollution control statutes, § 324.99903. Part 201 of NREPA governs environmental cleanup. Part 31 addresses protection of Michigan's water resources.

*Part 201 of NREPA:* Part 201 of NREPA addresses environmental remediation generally. §§ 324.20101–42. Section 324.20107a, in particular, requires that remedial measures be exercised with "due care ... in a manner that protects public health and safety":

> (1) *A person who owns or operates property* that he or she has knowledge is a facility shall do all of the following with respect to *hazardous substances* at the *facility:*
> (a) Undertake measures as are necessary to *prevent exacerbation of the existing contamination.*
> (b) *Exercise due care* by undertaking response activity necessary to mitigate unacceptable exposure to hazardous substances, *mitigate fire and explosion hazards due to hazardous substances,* and allow for the intended use of the facility in a manner that protects the public health and safety.

§ 324.20107a(1)(a)-(b) (emphasis added).

A "facility" is defined as "any area, place, or property where a hazardous substance in excess of the concentrations which satisfy the requirements of section 20120a(1)(a) or (17) or the cleanup criteria for unrestricted residential use under part 213 has been released, deposited, disposed of, or otherwise comes to be located." § 324.20101(1)(*o*). The court in *In re Approximately Forty Acres in Tallmadge Township* found that the Michigan legislature intended to define "facility" broadly. 223 Mich.App. 454, 566 N.W.2d 652, 656 (1997). In applying a broad definition of "facility" to a portion of NREPA that allowed a lien to be placed on a "facility," *id.,* 566 N.W.2d at 654, the court stated that "if hazardous substances are located on a part of the property, a lien may be placed on the entire, legally described, parcel of land." *Id.* at 656. The court stated, however, that "courts must analyze each situation case by

case". *Id.* On the basis of the following evidence, the court found an entire forty-acre parcel to be a "facility:"

> The hearing testimony indicated that the soil that had been contaminated had been moved to only one corner of the parcel. However, the testimony also indicated that there was no way to know if the subsurface soil was contaminated because the area is under landfill. Also, the ground water under twenty to thirty acres of the parcel was contaminated.

*Id.* at 656–67. Thus, an area larger than that which is contaminated may be a "facility."

An "owner" is defined as "a person who owns a facility." Mich. Comp. Laws Ann. § 324.20101(1)(z). An "operator" is defined as "a person who is in control of or responsible for the operation of a facility." § 324.20101(1)(y). In interpreting "operator," the Michigan Court of Appeals has stated that "in order for operator status to apply, a defendant must have had authority to control the operations or decisions involving the disposal of the hazardous substance, or assumed responsibility or control over the disposition of the hazardous substance." *Farm Bureau Mut. Ins. Co. v. Porter & Heckman, Inc.,* 220 Mich.App. 627, 560 N.W.2d 367, 378–79 (1996). The court also stated that "[a]bsent either actual ownership or possession of a facility, a nexus must exist between the defendant and the facility by which the defendant has assumed responsibility for, or managed, or had authority to control, or controlled, the operations involving the disposition or handling of the hazardous substance." *Id.,* 560 N.W.2d at 379.

Michigan law defines a "hazardous substance" with reference to, *inter alia,* "[h]azardous waste as defined in part 111." Mich. Comp. Laws Ann. § 324.20101(t)(iii). Part 111 defines "hazardous waste" as

> waste or a combination of waste and other discarded material including solid, liquid, semisolid, or contained gaseous material that because of its quantity, quality, concentration, or physical, chemical, or infectious characteristics ... may pose a substantial present or potential hazard to human health or the environment if im-

properly treated, stored, transported, disposed of, or otherwise managed. § 324.11103(3).

"Exacerbation of ... existing contamination" prohibited by § 324.20107a(1)(a) is defined as owner or operator activity causing either the migration of "existing contamination ... beyond the boundaries of the property which is the source of the release at levels above cleanup criteria specified in section 20120a(1)(a) [the residential drinking water protection criteria]," [16] or "[a] change in facility conditions that increases response costs." § 324.20101(1)(n).

Section 324.20107a(1)(b) requires owners or operators to "[e]xercise due care by undertaking response activities necessary to mitigate unacceptable exposure to hazardous substances, mitigate fire and explosion hazards due to hazardous substances, and allow for the intended use of the facility in a manner that protects the public health and safety." § 324.20107a(1)(b). "Response activity" is defined as "evaluation, interim response activity, remedial action, demolition, or the taking of other actions necessary to protect the public health, safety, or welfare, or the environment or the natural resources." § 324.20101(ee). "Remedial action," one of the many listed response activities, "includes, but is not limited to, cleanup, removal, containment, isolation, destruction, or treatment of a hazardous substance released or threatened to be released into the environment ... or the taking of other actions that may be necessary to prevent, minimize, or mitigate injury to the public health, safety, or welfare, or to the environment." § 324.20101(1)(cc).

Section 324.20107a is a public health, safety and welfare statute because "it is the purpose of [Part 201] to provide for appropriate response activity to eliminate unacceptable risks to public health, safety, or welfare ... from environmental contamination at facilities within the state." § 324.20102(c). Thus, "[h]arm to the public is presumed to flow from the violation of [section 324.20107a,] a valid statute enacted to preserve public health, safety and welfare." *Peterson*, 164 N.W.2d at 53; *see also People v.*

*McKendrick*, 188 Mich.App. 128, 468 N.W.2d 903, 909 (1991) (quoting *Peterson*, 164 N.W.2d at 53, and noting that such a violation "is characterized as a public nuisance").

*Part 31 of NREPA:* Part 31 of NREPA addresses water resources protection. Mich. Comp. Laws Ann. §§ 324.3101–33. At the time of the alleged taking, in May 1998, section 324.3109 prohibited the discharge of potentially injurious substances into the groundwater:

(1) A person shall not directly or indirectly discharge into the waters of the state a substance that is or may become injurious to any of the following:

(a) To the public health, safety, or welfare.

. . . .

(4) A violation of this section is prima facie evidence of the existence of a public nuisance and in addition to the remedies provided for in this part may be abated according to law in an action brought by the attorney general in a court of competent jurisdiction.

§ 324.3109(1), (4); *see also* § 324.3101(i) ("'Waters of the state' means groundwaters ....").

Section 324.3109 provides that a violation of the section is "prima facie evidence of the existence of a public nuisance." § 324.3109(4). This means that once the statute has been violated, there is a rebuttable presumption that a public nuisance exists, which the party in violation has the burden of disproving. *See State Farm Fire & Cas. Co. v. Couvier*, 227 Mich.App. 271, 575 N.W.2d 331, 333 (1998) (explaining the term "prima facie evidence" as "a rebuttable presumption that [the defendant] has the burden of disproving with evidence to the contrary," in a situation where a statute deemed an act "prima facie evidence of a violation" of that statute); *see also Shepherd Montessori Ctr. Milan v. Ann Arbor Charter Township*, 259 Mich.App. 315, 675 N.W.2d 271, 281 (2003) ("Prima facie evidence is defined in Black's Law Dictionary (7th ed.) as 'evidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.'").

---

16. "Residential drinking water protection criteria" is the "concentration [of contaminants] in

soil which is protective of groundwater." Tr. at 626:15–19 (Testimony of Mr. Reid).

Plaintiff argues that the force of Michigan nuisance law is blunted in this case because "mining is favored by Michigan public policy," Pl.'s Br. at 12, and that mining uncontaminated sand and gravel is not a nuisance per se, public nuisance, or nuisance in fact, *id.* at 15. Defendant responds that "[t]he law is clear that even the carrying out of lawful activities can generate nuisance impacts." Def.'s Br. at 45. Defendant argues that, "[i]n *Goldblatt v. Hempstead,* 369 U.S. 590, 591–93, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), no takings liability accrued from the government's placing regulatory restrictions on the operation of a sand and gravel pit when those restrictions were designed to prevent nuisance-like consequences." Def.'s Br. at 45. Plaintiff replies that "[t]he normal circumstances of an activity are entirely relevant as a background principle of property and nuisance law." Pl.'s Resp. Br. at 21–22. Plaintiff adds that several cases discussed by defendant "were all based on the determination that the mining in question would cause a nuisance under normal conditions[ ][and][t]he courts determined that the mining uses when applied to the property as they naturally existed would cause a nuisance." Pl.'s Resp. Br. at 22 (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *M & J Coal Co. v. United States,* 47 F.3d 1148 (Fed.Cir.1995); *Rith Energy, Inc. v. United States,* 44 Fed.Cl. 108 (1999)).

*Lucas* indicates that it is irrelevant to the present inquiry that mining is favored by Michigan public policy and that the business of sand and gravel mining is not a nuisance under Michigan law. In *Lucas,* the Court focused on the application of background principles to the intended use of property "in the *circumstances in which the land is presently found.*" 505 U.S. at 1031, 112 S.Ct. 2886 (emphasis added). Even if the general process of mining is not a nuisance under

state law, factual circumstances may make mining harmful to others. *See* Restatement (Second) of Torts § 821A cmt. c (1979) (noting that "for a nuisance to exist, there must be harm to another or the invasion of an interest").

Michigan courts have long recognized the state's broad law police power to abate public nuisances:

> "The police power is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction and abatement by summary proceedings of whatever may be regarded as a public nuisance. Under this power it has been held that the state may order the destruction of a house falling to decay, or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; [and] the destruction of decayed or unwholesome food . . . ."

*Osborn v. Charlevoix Circuit Judge,* 114 Mich. 655, 72 N.W. 982, 985 (1897) (quoting *Lawton v. Steele,* 152 U.S. 133, 136, 14 S.Ct. 499, 38 L.Ed. 385 (1894)).[17]

The background principles of Michigan nuisance law give the state police power to abate per se public nuisances caused by the violation of laws enacted to protect the public health, safety, and welfare. The court turns next to the application of these background principles to the facts before it.

### 2. Whether Michigan Law Could Abate Mining in the Area of Institutional Controls

Applying the standards set out in *Lucas* to the present situation, if the state government could have abated the particular use of property plaintiff intended under state law by physically excluding plaintiff from a portion

---

**17.** The state's power to abate nuisances is limited in certain circumstances. If a nuisance arises out of the operation of a legitimate business, the nuisance should be abated, if possible, in a way that does not completely destroy the business. *See, e.g., Rohan v. Detroit Racing Ass'n,* 314 Mich. 326, 22 N.W.2d 433, 446 (1946) ("'If a nuisance is private and arises out of a particular manner of operating a legitimate business, the court will do no more than point to the nuisance and decree adoption of methods calculated to eliminate injurious features.'"). The court observes that these limitations of police power are irrelevant to the case before it. The nuisances considered are not private; there is no allegation that an entire business is destroyed; and the nuisances would arise out of the ordinary operation of the business.

of plaintiff's leasehold, then no compensation is required.

### a. Whether Mining in the AIC Would Adversely Impact the Remediation

Defendant claims that an anticipatory nuisance would occur if plaintiff mined sand and gravel in the AIC because it would "impair the ability of the remedial action to remedy the contaminated groundwater." Def.'s Br. at 56. Part 201 of NREPA addresses environmental remediation. Mich. Comp. Laws Ann. §§ 324.20101–42. Section 324.20107a, in particular, imposes a duty on the operator of a facility to exercise due care in remediation of existing contamination and proscribes activity that exacerbates existing contamination. *See supra* Part II.B.1 (discussing the remedial duty of due care, *see* § 324.20107a(1)(b), and the prohibition against exacerbating existing contamination, *see* § 324.20107a(2)). Defendant argues that, because plaintiff's mining in the AIC would exacerbate existing contamination in violation of section 324.20107a, plaintiff's mining in the AIC would be a public nuisance. Def.'s Br. at 76. Before examining whether plaintiff would have violated the statute by mining in the AIC, the court must first decide whether the AIC is a "facility" and whether plaintiff is one "who owns or operates ... a facility." Mich. Comp. Laws Ann. § 324.20107a(1).

Plaintiff argues that "the uncontaminated sand and gravel within the AIC and outside the cap and not in the [Drum Area 1] soils is not a facility" because "an area without contamination is not a facility." Pl.'s Br. at 21–22. Defendant argues that the AIC is a facility and that plaintiff's construction of the term "facility" is too narrow. Def.'s Resp. Br. at 6–8. Defendant relies on *In re Approximately Forty Acres in Tallmadge Township*. Def.'s Br. at 7–8.

In accordance with the broad reading of "facility" given by the Michigan court in *In re Approximately Forty Acres*, noted above in Part II.B.1, the court finds that the AIC, in its entirety, is a "facility." The AIC was developed in 1998 with the goal of enclosing an area necessary to construct the Landfill cap and serve as an area of "institutional controls." Tr. at 153:24–154:11 (Testimony of Dr. Campbell). "Institutional controls" are "controls [that] are placed on the property for specific reasons, typically to protect individuals from future exposures, along with ensuring that the property remains in a protective condition." Tr. at 314:5–12 (Testimony of Mr. Williams). After construction of the Landfill cap was completed, the fence enclosing the AIC was moved in 2003 to enclose a smaller area.[18] Tr. at 154:24–155:21 (Testimony of Dr. Campbell). The 2003 fence enclosed an area of land necessary to "protect the integrity of the capping system." Tr. at 155:9–11 (Testimony of Dr. Campbell).

The groundwater in the shallow aquifer beneath the AIC exceeds Michigan drinking water criteria for Contaminants of Concern (COCs).[19] *See* DX 461b (Map, 2000 Extent of Impacted Groundwater, Shallow Aquifer, Metamora Landfill Site); DX 461c (Map, 1998/1999 Extent of Impacted Groundwater, Shallow Aquifer, Metamora Landfill Site); DX 461f (Map, 1993 Extent of Impacted Groundwater, Shallow Aquifer, Metamora Landfill Site).[20] Because the current fence

**18.** The Landfill cap was completed in 2001, but the fence was not moved until 2003. Tr. at 156:3–158:6 (Testimony of Dr. Campbell). Testimony indicated that the initiation of this lawsuit led to the relocation of the fence to encompass a smaller area. Tr. at 154:11–18 (Testimony of Dr. Campbell). Testimony further indicated that, although this suit was filed in 2002, the group responsible for the cleanup activities did not begin discussing the suit until 2003. Tr. at 157:23–158:6 (Testimony of Dr. Campbell).

**19.** Contaminants of concern, or constituents of concern (COCs), are the contaminants that have been identified in the groundwater at the Metamora Landfill to be of the most concern. Tr. at 620:15–25 (Testimony of Mr. Reid). The following COCs have been found at the Metamora Landfill site: acetone; arsenic; benzene; 1,2–dichloroethane; cis–1,2–dichloroethane; ethylbenzene; 4–methyl–2–petanone; toluene; 1,1,2–trichloroethane; trichloroethene; and vinyl chloride. JX 33 (Conceptual Site Model Report, *supra*, tbl. 4.1). Both the EPA and the Michigan Department of Environmental Quality approved this list. Tr. at 621:13–14 (Testimony of Mr. Reid).

**20.** Exhibits DX 461b, DX 461c and DX 461f map groundwater monitoring wells and highlight those where COCs exceeding Michigan drinking water criteria exist. The court bases its conclu-

encloses the hazardous substances and an area necessary to protect the AIC and individuals who may be exposed to the hazardous substances within it, and because groundwater contamination exists beneath the AIC, the court finds that the AIC is a "facility." With respect to the area of land located between the 1998 and 2003 fence locations, the court finds that this area is not a facility.[21]

Having found that the AIC is a "facility," the court examines whether plaintiff is an "own[er] or operat[or]" with "knowledge" that its property is a facility. *See* Mich. Comp. Laws Ann. § 324.20107a(1)(a)-(b) (requiring "[a] person who owns or operates a property that he or she has knowledge is a facility to prevent exacerbation of [ ] existing contamination," and imposing a duty to exercise "due care by undertaking response activity necessary to mitigate unacceptable exposure to hazardous substances, mitigate fire and explosion hazards due to hazardous substances, and allow for the intended use of the facility in a manner that protects the public health and safety"). Although neither party addressed plaintiff's status as an "own[er] or operat[or]" with "knowledge" that its property is a "facility," *cf.* § 324.20107a(1)(a), the court nonetheless addresses these statutory requirements.

Substantial and uncontroverted evidence supports both plaintiff's knowledge of the "facility" status of the AIC and its role as an "operat[or]" of the AIC. The court finds that plaintiff "operates" the facility because plaintiff "had authority to control … the operations involving the disposition or handling of

the hazardous substance." *Farm Bureau Mut. Ins. Co.*, 560 N.W.2d at 379. The court bases this conclusion on the fact that plaintiff's Lease grants to plaintiff the leasehold area, including the AIC, for plaintiff's "exclusive use." *See* JX 1 (Lease ¶ 1). John R. Sand's understanding of the Lease is that its right to mine the property would preclude any other uses of the property, Tr. at 365:1–13 (Testimony of Mr. Evatz), an understanding that has been upheld in *County Transfer Stations, Inc. v. John R. Sand & Gravel Co.*, where the court found that John R. Sand had no obligation to accommodate County Transfer Stations' business, which operated on the leasehold. No. 236611, 2003 WL 22495581, at *3 (Mich.Ct.App. Nov.4, 2003). John R. Sand, likewise, had no obligation to accommodate the Landfill operation and could have halted the operations of the Landfill at any time. Its "authority to control … the operations involving the disposition or handling of the hazardous substance," *Farm Bureau Mut. Ins. Co.*, 560 N.W.2d at 379, renders plaintiff one who "operates" a facility. Furthermore, there can be no dispute that plaintiff "has knowledge [that the AIC] is a facility." Mich. Comp. Laws Ann. § 324.20107a(1). Plaintiff's cooperation with the Landfill operations and the continuous awareness by plaintiff's current president, Mr. Evatz, *see* Part II.A.4, *supra*, of events on the property since 1970, are sufficient to charge plaintiff with knowledge of its status as a "facility."

In order to determine whether mining in the AIC would violate John R. Sand's duties as the operator of a facility under Section 324.20107a to exercise due care in

---

sion that the shallow aquifer beneath the AIC, as a whole, is contaminated on the comparison of the monitoring wells located to the south of the Landfill and to the north of the Landfill. Exhibits DX 461b, DX 461c and DX 461f all show that exceedances exist both to the south and to the north and northwest of the Landfill area. *See, e.g.*, DX 461b (Map, 2000 Extent of Impacted Groundwater, Shallow Aquifer, Metamora Landfill Site, demonstrating that MW36–98, MW37–98 and MW17S–98, all to the south of the Landfill, and MW–8, MW–16, MW31A–94 and MW24D–98, all to the north of the Landfill, had COCs exceeding Michigan drinking water criteria). Because "[g]roundwater flow [in the shallow aquifer] is predominantly to the north and northwest," JX 33 (Conceptual Site Model Re-

port, *supra*, at 62), the groundwater in the shallow aquifer between the contaminated southern wells and the contaminated northern wells is contaminated.

21. The fact that the court finds this area not to be a facility does not affect the outcome of this case. The court ruled, above, that defendant is not liable for a taking in this case because plaintiff contributed to the problem defendant sought to resolve by acquiring its leasehold interest subject to the Landfill operation and by cooperating with the Landfill operation. *See supra* Part II.A.4 (discussing defendant's defense that plaintiff acquired its leasehold subject to the Landfill operation).

remediation and to avoid exacerbating existing contamination, the court reviews evidence regarding the "natural attenuation" remediation program in operation at the Metamora Landfill site.

Natural attenuation, or biodegredation, a process whereby natural processes in the environment "treat the chemicals and reduce their concentration," Tr. at 615:6–12 (Testimony of Mr. Reid), is occurring at the Metamora Landfill site. Tr. at 784:5–23 (Testimony of Dr. Vanderpool); JX 33 (Conceptual Site Model Report, *supra*, exec. summ. xii). The type of natural attenuation that is occurring at the Metamora Landfill site is biodegradation. Tr. at 784:5–23 (Testimony of Dr. Vanderpool); JX 33 (Conceptual Site Model Report, *supra*, exec. summ. xii). In the biodegradation process, microorganisms break down contaminants either directly, by digesting the contaminant, or indirectly, by producing enzymes that break down contaminants, and, at the end of the process, a formerly hazardous chemical is no longer hazardous. Tr. at 784:5–786:15 (Testimony of Dr. Vanderpool).[22] One indicator that biodegradation is occurring at the Metamora Landfill site is the stability of the contaminant plume. Tr. at 801:5–802:19 (Testimony of Dr. Vanderpool). Dr. Vanderpool testified that, when she examined the data in 2000, contamination levels at particular shallow aquifer groundwater monitoring wells were going down and contamination levels decreased as the groundwater moved away from the Landfill. Tr. at 801:18–802:14.

Given the conditions of the site, the question is what would happen if John R. Sand were to mine in the AIC. Dr. Vanderpool testified to a number of hydrogeological effects that could be caused by excavating in the AIC. Tr. at 1326:22–1328:8.[23] Dr. Vanderpool also testified that excavating in the AIC would interrupt the biodegradation process by exposing the biodegradation microbes to oxygen. Tr. at 1329:21–1330:5. She explained that

> the microorganisms that ... biodegrade the chlorinated hydrocarbons at this site[ ] don't like oxygen.... [A]n excavation has the potential of exposing more ... of the vadose zone to oxygen, put[ting] that oxygen deeper down, wherever the bottom of the excavation is, so you have the potential of interrupting the biodegradation microbes that you're relying on.

Tr. at 1329:22–1330:5. If the biodegradation process is interrupted, the concentration of chemicals will not be reduced to the extent that they are currently being reduced.

COCs at levels exceeding Michigan drinking water criteria already exist in both the shallow and intermediate aquifers. JX 33 (Conceptual Site Model Report, *supra*, exec. summ. vii). "The extent of the groundwater criteria extends approximately 500 feet from the property boundary .... This extent has remained consistent over time ..." *Id.* (Conceptual Site Model Report, *supra*, at 40). "The exceedance of [drinking water criteria in the intermediate aquifer] occurs at 1,000 feet downgradient of the Site ...." *Id.* (Conceptual Site Model Report, *supra*, at 52). One effect of biodegradation at the site is that groundwater contamination levels decreased as one moved away from the Landfill. Tr. at 801:4–802:16 (Testimony of Dr. Vanderpool). Digging inhibits the biodegradation process by introducing oxygen into the soil, thus increasing the volume of contaminants. Inhibiting the biodegradation process undoes the remedial effects put in place by the AIC.

Because the court finds that John R. Sand is an operator of a facility and that plaintiff's mining is "an activity undertaken by [a] per-

---

**22.** The Conceptual Site Model Report provides a more technical description of biodegradation:

> Microbial biodegradation involves the utilization of carbon from an organic compound (the substrate) for microbial cell growth. As part of the biodegradation process, electrons are transferred from the organic substrate (electron donor) to an available electron acceptor. The transfer of electrons is defined as an oxidation-reduction (redox) reaction. Energy de-

rived from this transfer of electrons is utilized by soil microorganisms for cellular respiration. JX 33 (Conceptual Site Model Report, *supra*, at 67–8).

**23.** "[E]xcavations and filling and drilling and mining would" pose a "risk to the remedy" implemented by the AIC by, for example, destabilizing the flow system or disturbing till lenses and creating new releases. Tr. at 1326:22–1327:16 (Testimony of Dr. Vanderpool).

son who ... operates [a] property that he or she has knowledge is a facility," Mich. Comp. Laws Ann. § 324.20107a(1), plaintiff has a duty to "[e]xercise due care," § 324.20107a(1)(b), by taking "[r]emedial action" in the "cleanup, removal, containment, isolation, destruction or treatment of a hazardous substance released or threatened to be released into the environment," § 324.20101(1)(cc). Because plaintiff's mining would inhibit the "treatment of a hazardous substance released or threatened to be released" and therefore fail to "mitigate injury to the public health, safety, ... welfare, or ... environment," the court finds that plaintiff's mining in the AIC would violate section 324.20107a(1). *See* § 324.20101(1)(cc) (defining "[r]emedial action").

Defendant argues that section 324.20107a is a public health, safety and welfare statute because it was "designed to protect the public health, safety, and welfare," Def.'s Br. at 76 & n. 28, and that "under the doctrine set forth in the *Peterson* decision, a violation of that statute would be *presumed* to be a public nuisance." *Id.* at 76. The court agrees with defendant that section 324.20107a is a public health, safety and welfare statute because "it is the purpose of [Part 201] to provide for appropriate response activity to eliminate unacceptable risks to public health, safety, or welfare ... from environmental contamination at facilities within the state." Mich. Comp. Laws Ann. § 324.20102(c). Thus, "[h]arm to the public is presumed to flow from the violation of [section 324.20107a,] a valid statute enacted to preserve public health, safety and welfare." *Peterson,* 164 N.W.2d at 53; *see also People v. McKendrick,* 188 Mich.App. 128, 468 N.W.2d 903, 909 (1991) (quoting *Peterson,* 164 N.W.2d at 53, and noting that such a violation "is characterized as a public nuisance").

Because the court finds that mining in the AIC would violate section 342.0107a by adversely impacting the existing remediation, plaintiff's mining activity would be presumed to be a public nuisance. Plaintiff was required to rebut the presumption of public

harm but failed to do so. In particular, plaintiff presented no evidence that interruption of the biodegradation process would not occur. Thus, the court finds that plaintiff's mining in the AIC would cause a public nuisance by violating plaintiff's obligations under Part 201 of NREPA.

### b. Whether Mining in the AIC Would Further Pollute Groundwater

Defendant alleges that plaintiff's mining in the AIC would "further pollute the already-contaminated groundwater." Def.'s Br. at 56. Defendant argues that it is "well established that groundwater pollution constitutes a nuisance," Def.'s Resp. Br. at 28 (citing *White Lake Improvement Ass'n v. City of Whitehall,* 22 Mich.App. 262, 177 N.W.2d 473, 481 (1970)), and that "[i]t is not necessary to prove that [groundwater] pollution will contaminate a [residential] well in order to establish a public nuisance," *id.* at 27. Defendant also states that "*Adkins* does not hold ... that the state cannot act to abate a nuisance until there is proof that the contamination has reached a well," and that *Adkins* only addressed whether a private nuisance claim could be based solely on " 'unfounded fear.' " Def.'s Br. at 28 (quoting *Adkins,* 487 N.W.2d at 721). Plaintiff argues that trial evidence demonstrated nothing more than "mining uncontaminated sand and gravel in the AIC may cause a risk that the contamination plume might move," and that this evidence was too "speculati[ve]" to support a finding of an anticipatory nuisance. Pl.'s Resp. Br. at 25.

The evidence at trial provided a wealth of hydrogeologic information about the Metamora Landfill site. The land at the Metamora Landfill site consists of the following hydrogeologic units (starting at the surface of the ground and going down): vadose zone,[24] shallow aquifer, upper till aquitard, intermediate aquifer, lower till aquitard and bedrock aquifer. JX 33 (Conceptual Site Model Report, *supra,* exec. summ. v). Till lenses also exist at the Metamora Landfill site.[25] *See*

---

**24.** The "[v]adose zone is ... an unsaturated zone that's the zone between the surface of the ground and the aquifer that is not saturated with water." Tr. at 628:11–14 (Testimony of Mr. Reid).

**25.** Geomorphic evidence and the 1994 pre-design hydrologic investigation report support the conclusion that till lenses exist at the Metamora Landfill site. Tr. at 1324:8–1325:10 (Testimony

Tr. at 1325:9–10 (Testimony of Dr. Vanderpool, stating that there are "definitely" till lenses at the Metamora Landfill site); *see also* JX 3, at D0185–86 (E.C. Jordan Co., Site Investigation Final Report 32–33 (Feb.1986)), stating, in a section on regional hydrology, that "[l]ocalized zones of perched groundwater exist where clay lenses are found at clevations above the water table". A till lens, as opposed to a till layer, is a small piece of till that is not horizontally large. Tr. at 1319:22–25 (Testimony of Dr. Vanderpool). Till consists of compacted material, such as silt and clay, that is not very permeable. Tr. at 631:8–12 (Testimony of Mr. Reid). A till "can and usually [does] keep contamination from moving down to the next layer." Tr. at 1320:13–14 (Testimony of Dr. Vanderpool); *see also* Tr. at 813:14–17 (Testimony of Dr. Vanderpool, stating that a till layer is "pretty impermeable").

COCs at levels exceeding Michigan drinking water criteria exist in both the shallow and intermediate aquifers beneath the Metamora Landfill site. JX 33 (Conceptual Site Model Report, *supra*, exec. summ. vii). "The extent of the groundwater plume [in the shallow aquifer] exceeding Michigan generic residential drinking water criteria extends approximately 500 feet from the property boundary .... This extent has remained consistent over time ...." *Id.* (Conceptual Site Model Report, *supra*, at 40). Contaminants have migrated from the shallow aquifer to the intermediate aquifer through the upper till. *Id.* (Conceptual Site Model Report, *supra*, exec. summ. vii-viii). "The exceedance of [drinking water criteria in the intermediate aquifer] occurs at 1,000 feet downgradient of the Site ...." *Id.* (Conceptual Site Model Report, *supra*, at 52). Dr. Vanderpool offered two hypotheses regarding why the usually "impermeable" till layer was not able to stop the migration of contamination from the shallow aquifer to the intermediate aquifer: discontinuities (holes) within the up-

per till and fractures in the upper till. Tr. at 1317:4–1318:8, 1319:6–9.

There is currently no contamination in the bedrock aquifer of the Metamora Landfill site, possibly because "[t]he presence of the Lower Till may be preventing migration to this aquifer." JX 33 (Conceptual Site Model Report, *supra*, exec. summ. viii). Dr. Vanderpool testified that, in the future, it is possible that contaminants will migrate to the bedrock aquifer. Tr. at 1318:15–18. Dr. Vanderpool testified that this possibility has not been quantified and that no studies have predicted when and under what circumstances contamination of the bedrock aquifer might occur, Tr. at 1336:21–1337:10, but she did explain how the migration of the contamination might occur: "Just as we have discontinuity in the upper till, we've also documented discontinuity in the lower till. It occurs further north, but it's there. And we still have the possibility that if the fracturing phenomenon is occurring, that too can occur in the lower till." Tr. at 1318:20–25. Additionally, the Conceptual Site Model Report states that "contamination was found within [thirty] feet of the bedrock aquifer and a downward gradient is suspected between the intermediate and bedrock aquifers." JX 33 (Conceptual Site Model Report, *supra*, exec. summ. iii). The bedrock aquifer is the source of the residential water supply. Tr. at 1319:3–5 (Testimony of Dr. Vanderpool).

There are fourteen domestic water wells downgradient of the Metamora landfill site. JX 33 (Conceptual Site Model Report, *supra*, at 64). Twelve of the wells draw water from the bedrock aquifer and two draw water from the shallow aquifer. *Id.* The wells in the shallow aquifer are 2350 feet and 2500 feet downgradient of the Metamora Landfill site. *Id.*

Dr. Vanderpool stated that drilling and excavating could disturb the till lenses and

of Dr. Vanderpool). The presence of surface water bodies in an area with deep groundwater, as exists in the Metamora Landfill area, indicates that till lenses exist because "to have a surface water body remain[] means you have to have something that holds the ground water, otherwise the surface water would just recharge down to the main ground water body." Tr. at 1324:9–

20 (Testimony of Dr. Vanderpool). The pre-design hydrologic investigation drilled into the ground looking for saturated zones that form on the top of till lenses, called "perched water," and found them under and to the south of the Landfill. Tr. at 1324:22–1325:15 (Testimony of Dr. Vanderpool).

create a new pathway for materials deposited on a till lens to reach the shallow aquifer. Tr. at 1327:8–25. The industrial history at the site indicates that it is possible that contamination is sitting on the till lenses at the Landfill site. Tr. at 1324:1–3 (Testimony of Dr. Vanderpool). Dr. Vanderpool testified that barrels containing chlorinated hydrocarbons in liquid form were dumped at the Landfill site. Tr. at 1321:2–12. Chlorinated hydrocarbons are dense, non-aqeous phase liquids (DNAPL), meaning that they are insoluble, resist going into the aqueous phase and are heavier than water and sink downward under gravity. Tr. at 1321:15–1323:4. When the contents of the drums containing the chlorinated hydrocarbons spilled, some of the liquid stayed in the soils and was excavated, but evidence was not found that indicated where all of the fluids went. Tr. at 1321:9–14. Dr. Vanderpool testified that there is no evidence that DNAPLs have impacted the groundwater or that DNAPLs have moved through the till lenses. Tr. at 1322:5–9, 1323:25–1324:1. While Dr. Vanderpool could not say "absolutely" that DNAPLs at the site exist, she stated that it was "possible" that DNAPLs are "probably" sitting on the till lenses. Tr. at 1324:1–6.

In contrast to the hypothesized existence of DNAPLs at the site, uncontradicted evidence confirms that contaminants are dissolved in the groundwater and move with the groundwater. Tr. at 1320:21–1321:1 (Testimony of Dr. Vanderpool). The contaminants that are dissolved in the groundwater can also rest, or perch, on a till lens. Cf. JX 3, at D0185–86 (E.C. Jordan Co., Site Investigation Final Report 32–33 (Feb.1986)), stating, in a section on regional hydrology, that "[l]ocalized zones of perched groundwater exist where clay lenses are found at elevations above the water table". Dr. Vanderpool testified that she is not aware of any studies regarding the Metamora Landfill site that quantify the possibility of contamination stopping at a till lens. Tr. at 1339:18–1340:3.

Further, Dr. Vanderpool testified that the possibility that till lenses are retaining contaminants "could be good news, as long as [the contaminants] stay there and nobody bothers them[,] … [but][i]t could be bad

news if, for some reason, the [contaminants] came off of them." Tr. at 1322:18–23. She stated that if a thick enough layer of contamination rests on a till lens, the contamination can come off the lens by penetrating through the till or by flowing off the lens. Tr. at 1323:1–5. In the case of DNAPLs, the flow of the contamination follows the geometry of the till layer, which can create a situation where the contamination flows in a direction different than that of the groundwater. Tr. at 1323:5–24. Dr. Vanderpool also testified that excavating could disturb the till lenses and create a new release, or pathway, for materials deposited on a till lens to reach the shallow aquifer. Tr. at 1327:8–1328:1.

While it is possible that plaintiff's mining of the AIC after May 1998 could cause additional contaminants to reach the shallow and intermediate aquifers, the court does not find that significant harm from groundwater contamination is a "practically certain or strongly probable result or a natural or inevitable consequence" of plaintiff's mining in the AIC. Falkner, 117 N.W.2d at 128. The two residential wells in the shallow aquifer at 2350 and 2500 feet downgradient of the Metamora Landfill site are not contaminated. JX 33 (Conceptual Site Model Report, supra, at 64). Plaintiff's mining Lease has been in effect since 1969, see supra Part I (discussing the history of this case), during which time groundwater contamination has spread to 500 and 1000 feet from the AIC, JX 33 (Conceptual Site Model Report, supra, at 40, 52); it therefore appears "contingent" or "doubtful" that contamination will spread to residential wells 2350 and 2500 feet away were plaintiff to mine in the AIC. Thompson–McCully Co., 608 N.W.2d at 537 ("Equity will not interfere where injury from an anticipated nuisance is doubtful or contingent."). While "[t]he more serious the impending harm, the less justification there is for taking the chances that are involved in pronouncing the harm too remote," Restatement (Second) of Torts § 933 cmt. b, and while expansion of the contaminant plume and the possibility that it will reach residential wells is a very serious harm, the likelihood that it will occur appears to the court to be remote.

Defendant also argues that mining in the AIC would violate Part 31 of NREPA. Def.'s Br. at 70. Part 31 provides in part:

(1) A person shall not directly or indirectly discharge into the waters of the state a substance that is or may become injurious to any of the following:

(a) To the public health, safety, or welfare.

Mich. Comp. Laws Ann. § 324.3109(1)(a). Defendant argues that "[b]ecause mining in the AIC would likely ... result in the discharge of injurious substances into the groundwater, it is unlawful under ... Part ... 31." Def.'s Br. at 72. Defendant adds that, under section 324.3109(4), "it would be a *prima facie* public nuisance." Def.'s Br. at 77. Plaintiff did not respond to this argument in its post-trial briefing. The absence of argument from plaintiff appears to be based on plaintiff's contention that "[d]efendant has abandoned its argument that Part 31 of NREPA ... is a background principle of nuisance law. Defendant introduced no exhibits and provided no testimony that plaintiff's mining sand and gravel within the AIC would discharge any pollutants." Pl.'s Br. at 20 n. 11.

The court agrees with the main point in plaintiff's argument that mining will not likely cause new discharges of pollutants. The court concludes, however, that the testimony concerning water pollution and the hydrogeology of the Metamora Landfill site strongly supports the court's conclusion above in Part II.B.2.a that mining would adversely impact the existing remediation of groundwater contamination. Precisely because the location of till lenses is uncertain, Tr. at 1337:18–1339:17 (Testimony of Dr. Vanderpool that the she is not aware of any study documenting the exact location of till lenses), and because the disturbance of till lenses could create new pathways for pollution to spread, Tr. at 1327:8–1328:1 (Testimony of Dr. Vanderpool), plaintiff, as operator of a facility, could not mine without violating its duty to exercise due care to "clean[ ]up, remov[e], contain[ ], isolat[e], destr[oy], or treat[ ] ... a hazardous substance released or *threatened to be released* into the environment." Mich. Comp. Laws Ann. § 324.20101(1)(cc) (emphasis added); *see also*

§ 324.20107a(1)(b) (articulating a facility operator's duty to exercise due care). The same facts that make it uncertain that excavating in any particular location will cause the discharge of injurious substances also make it uncertain that excavating in any particular location will not cause such a discharge and adversely impact the remediation effort.

c. Whether Mining in the AIC Would Cause a Nuisance Risk From Methane

Defendant argues that "mining within the AIC would create a public health risk because of the significant levels of methane emissions from the Metamora Landfill." Def.'s Br. at 75. To find a common law public nuisance with respect to methane, the court must determine that plaintiff's mining in the AIC would result in a significant harm that is a "practically certain or strongly probable result or a natural or inevitable consequence," *Falkner*, 117 N.W.2d at 128, of plaintiff's mining. In a case where, as here, the threatened hazard is serious, even catastrophic, "the less justification there is for taking the chances that are involved in pronouncing the harm too remote." Restatement (Second) of Torts § 933 cmt. b. The court must also find that plaintiff's mining would unreasonably interfere with "a common right enjoyed by the general public" and would either "significantly interfere[ ] with the public's health, safety, peace, comfort, or convenience," or would be "proscribed by law." *Cloverleaf Car Co.*, 540 N.W.2d at 300.

In addition to its non-statutory nuisance argument, defendant also argues that "[m]ining in the AIC ... increases the risks of explosive conditions in violation of the duty to mitigate fire and explosion hazards under [§ 324.20107(a)(1)(b) of NREPA]." Def.'s Resp. Br. at 12. Because plaintiff is an operator of a facility, *see* Part II.B.2.a *supra,* and because section 324.20107a is a public health and safety statute, Mich. Comp. Laws Ann. § 324.20102(c), "[h]arm to the public is presumed to flow from the violation of [section 324.20107a,] a valid statute enacted to preserve public health, safety and welfare." *Peterson,* 164 N.W.2d at 53; *see also People*

*v. McKendrick,* 188 Mich.App. 128, 468 N.W.2d 903, 909 (1991) (quoting *Peterson,* 164 N.W.2d at 53, and noting that such a violation "is characterized as a public nuisance"). The court now reviews the evidence regarding methane risks from the Metamora Landfill.

"When garbage degrades, it generates methane." Tr. at 232:1–2 (Testimony of Dr. Campbell); *see also* Tr. at 905:18–19 (Testimony of Mr. Henry, stating that "[m]ethane gas is formed in anaerobic conditions within [a] landfill"). Methane gas can travel laterally and follows the path of least resistance through the soil, so one does not generally know where methane gas is going to come up or where it might collect. Tr. at 1174:23–1175:2 (Testimony of Mr. Sygo); *see also* Tr. at 232:2–3 (Testimony of Dr. Campbell, stating that methane "migrates laterally"). Mr. Henry testified that there are two hazards posed by methane gas: explosion and asphyxiation. Tr. at 907:3–5; *see also* Tr. at 232:2 (Testimony of Dr. Campbell, stating that "methane gas is an explosive gas"). Methane gas is "extremely flammable," Tr. at 907:7–9 (Testimony of Mr. Henry), so much so that "if you get a significant collection of methane ... a spark could cause an ignition and an explosion," Tr. at 1174:13–15 (Testimony of Mr. Sygo).

A flammable gas has a range within which it will combust: "Below the lower explosive limit, the concentration of the flammable gas is not high enough to support combustion, and above the upper explosive limit, the concentration is so high ... that it will not support combustion." Tr. at 911:2–8 (Testimony of Mr. Henry). The lower explosive limit for methane is five percent. Tr. at 315:18–20 (Testimony of Mr. Williams); 233:25–234:11 (Testimony of Dr. Campbell). Testimony did not indicate what the upper explosive limit of methane is, but testimony did indicate that fifty percent is "far above the upper explosive limit." Tr. at 911:13–14 (Testimony of Mr. Henry). Methane at concentration levels of concern "tend[s] to collect in areas where you have structures, houses, any type of buildings, and in those situations, if you get a significant collection of methane ... a spark could cause an ignition and an explosion." Tr. at 1174:9–15 (Testimony of Mr. Sygo); *see also* Tr. at 1174:15–22 (Testimony of Mr. Sygo describing the explosion of a private residence "as a result of methane migration into a residential area from an [adjacent] landfill"). With respect to asphyxiation, Mr. Henry testified that "if there's an underground structure, [methane gas] can actually displace the ambient air from there ... [and] it could be an asphyxiation hazard ...." Tr. at 907:13–18.

The "major component" of the Metamora Landfill cap system remedy is "gas vents that vent any pressure from the methane buildup in the landfill." Tr. at 682:11–19 (Testimony of Mr. Reid); *see also* Stip. Facts ¶ 16 (stating that the Landfill cap system remedy consists of, among other components, "installation, monitoring, and maintenance of a landfill gas venting system"). One of the reasons people are excluded from the AIC by a fence is because of the methane vents in the Landfill. Tr. at 315:6–13 (Testimony of Mr. Williams). Mr. Williams testified that if someone were to light a match or smoke a cigarette in the AIC, an explosion could occur if methane exceeded the lower explosive limit. Tr. at 315:13–17. Mr. Henry testified that, as far as he knows, the investigation regarding methane at the Metamora Landfill site has not been completed. Tr. at 907:24–908:1. Mr. Henry also testified that

> it was recognized visually that methane had been migrating from the landfill. On the eastern and northern perimeters of the landfill, there are mature trees that have died, undoubtedly as a result of methane migration displacing the oxygen from the soil that the trees' roots need in order to respire.

Tr. at 908:1–7; *see also* Tr. at 1177:2–8 (Testimony of Mr. Sygo, stating that methane gas "can cause ... trees to die ... and one of the indications of methane in some cases is looking at the vegetative growth in the immediate vicinity of the landfill to see if there's browning, and if there's ... stress vegetation in those areas").

Michigan performed a soil gas survey on the Hughes property, which borders the northeastern corner of the Metamora Landfill site. Tr. at 908:21–24 (Testimony of Mr.

Henry). Michigan performed two borings-one twenty feet from the Landfill and the other two-hundred feet east of the Landfill site, and both between forty-five and fifty feet deep. Tr. at 909:1–6, 909:23–910:1 (Testimony of Mr. Henry). In the boring twenty feet from the Landfill, the state found the methane concentration to be "approximately fifty percent" by volume. Tr. at 910:6–10 (Testimony of Mr. Henry). In the boring two hundred feet from the Landfill site, the state found "normal soil gas compositions with no detectable concentrations of methane." Tr. at 910:14–17 (Testimony of Mr. Henry). There are also soil gas probes on the "southeast corner of the landfill, just to the northeast of the current retention pond, and ... on the southwest corner of the landfill area, near the original access road to the landfill." Tr. at 923:22–924:2 (Testimony of Mr. Henry). Mr. Henry testified that he believes these probes show methane concentrations above the lower explosive limit, "about [ten] to [fifteen] percent by volume." Tr. at 924:5–8. These concentrations are above the lower explosive limit (five percent) for methane, see Tr. at 315:18–20 (Testimony of Mr. Williams), and appear to be within the upper explosive limit. Tr. at 911:13–14 (Testimony of Mr. Henry). Mr. Henry stated that it is "possibl[e]" that the methane gas migrating off the site is caused by the construction of the Landfill cap, but admitted that he did not know if the Landfill cap was the cause of the migration. Tr. at 924:10–16.

Mr. Sygo testified regarding the prohibition against excavating in an area where institutional controls are in place, noting that the presence of "institutional controls ... might restrict the ability to excavate or to disturb any of the materials within an area that you have a remedy that's in place ...." Tr. at 1177:21–1178:2. Mr. Sygo emphasized that "with a landfill situation, where you have a containment system that includes a cap, you certainly don't want somebody excavating in a manner that's going to allow you ... to impact ... the methane collection system, because that could ... potentially exacerbate the situation and certainly impact on the long-term effectiveness of the remedy." Tr. at 1178:8–16. Mr. Sygo also testified that a spark could cause an explosion in the presence of a significant collection of methane, Tr. at 1174:9–15, and Mr. Henry testified that "in a[ ] confined space when [methane is] mixed with air, an ignition source can cause the situation to explode," Tr. at 907:18–19.

With respect to the common law nuisance risk of fire and explosion from methane gas, defendant must show that plaintiff's proposed use of the AIC-that is, mining sand and gravel-would result in a public nuisance that is a "practically certain or strongly probable result or a natural or inevitable consequence." *Falkner*, 117 N.W.2d at 128. One of the purposes of the AIC is to prevent the possibility that an ignition source would get too close to a methane vent. Tr. at 315:6–17 (Testimony of Mr. Williams). If plaintiff were to mine sand and gravel in the AIC, plaintiff would have to go inside the fenced AIC perimeter designed, among other purposes, to prevent methane explosions caused by people being too close to methane vents. An explosion on the Metamora Landfill site would be a very serious harm affecting adjacent landowners. As the Restatement notes, "[t]he more serious the impending harm, the less justification there is for taking the chances that are involved in pronouncing the harm too remote." Restatement (Second) of Torts § 933 cmt. b. The seriousness of the harm must be weighed against the likelihood that it will occur, and absolute certainty is not required where the harm is sufficiently serious. The court finds that a methane explosion at the Metamora Landfill site is a very "significant harm," *Thompson–McCully Co.*, 608 N.W.2d at 537, and given the seriousness, the harm is not so "doubtful or contingent," *Foster*, 46 N.W.2d at 429, as to be a risk that would be allowable under Michigan nuisance law.

The right to be free from explosion and fire hazards is one of the "common right[s] enjoyed by the general public." *Cloverleaf Car Co.*, 540 N.W.2d at 300; *see also Buckeye Union Fire Ins. Co.*, 178 N.W.2d at 480 (stating that "the very nature of the nuisance ... [of] a fire hazard" is that "sheer chance or an act of God (lightning) would convert the peril to the neighboring land into a destructive force."). The Restatement (Second) of Torts states, with respect to public

rights, that "a fire hazard to [even] one adjoining landowner may be a public nuisance because of the danger of a conflagration." Restatement (Second) of Torts § 821B cmt. g. Because the court finds it sufficiently likely that plaintiff's presence in the AIC would cause significant harm to adjoining landowners, the court finds that plaintiff's presence would also "unreasonabl[y]" and "significantly interfere[ ] with the public's health, safety, peace, comfort, or convenience." *Cloverleaf Car Co.*, 540 N.W.2d at 300.

The court also finds that plaintiff's presence in the AIC is "proscribed by law." *Cloverleaf Car Co.*, 540 N.W.2d at 300. The court found, above, that plaintiff is one who "operates ... a facility." *See supra* Part II.B.2.a. The Metamora Landfill site contains a combination of waste that, if improperly treated, may pose a substantial hazard to human health or the environment because of the danger of a methane explosion. Thus, the methane at the site is "hazardous waste" under section 324.11103(3) and a "hazardous substance" under section 324.20101(t). Because methane gas is a hazardous substance, section 324.20107a(1)(b) requires plaintiff to exercise due care by taking actions necessary to protect the public health, safety, or welfare by mitigating fire and explosion hazards due to methane gas. The court finds that plaintiff's presence in the AIC, an area designed to mitigate the risk of explosion due to methane gas by barring unnecessary presence in the area, is prohibited by section 324.20107a(1)(b) and that plaintiff's presence in the AIC would violate that section.

The court has determined, *see supra* Part II.B.2.a, that section 324.20101a is a public health, safety and welfare statute and, as such, under *Peterson,* harm to the public is presumed to flow from its violation. *See Peterson,* 164 N.W.2d at 53 ("Harm to the public is presumed to flow from the violation of a valid statute enacted to preserve public health, safety and welfare."). Accordingly, plaintiff was required to present evidence that would rebut the presumption of public harm. Plaintiff has neither presented an argument nor pointed to evidence that would rebut the presumption that harm would flow from its violation of section 324.20107a(1)(b)

with respect to methane. The court finds that if plaintiff were present in the AIC, plaintiff's presence would be "proscribed by law," *Cloverleaf Car Co.,* 540 N.W.2d at 300, and that plaintiff has not rebutted the presumption that "[h]arm to the public [would] flow from the violation," *Peterson,* 164 N.W.2d at 53. For the foregoing reasons, plaintiff's presence in the AIC would be a public nuisance.

### d. Whether Michigan Could Have Abated Mining in the AIC Because of Public Nuisances

Having found that plaintiff's presence and mining in the AIC would create public nuisances, the court must determine whether the state could have abated those nuisances by prohibiting plaintiff from using the AIC. *See Lucas,* 505 U.S. at 1029, 112 S.Ct. 2886 (stating that limitations on the use of property must "do no more than duplicate the result that could have been achieved ... by adjacent landowners ... under the [s]tate's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise").

Defendant relies on a number of NREPA provisions to argue that Michigan has the right to physically enter a property to abate a nuisance. *See* Defendant's Pretrial Memorandum of Contentions of Fact and Law at 49–51 (arguing that "physical ouster is allowed in order to abate certain nuisances"(emphasis omitted)). Plaintiff argues that "Michigan law requires that abatement of a nuisance be carefully tailored to avoid injury in legitimate business operations. Defendant has cited no Michigan case that hold[s] that the government may permanently and physically occupy real property to abate a nuisance. Plaintiff's research discloses no such case." Pl.'s Br. at 30. Nor has the court found such a case or, indeed, any Michigan case closely analogous to this one.

The court has found that, if plaintiff were to mine in the AIC, plaintiff would cause common law nuisances by adversely impacting the remediation of methane emissions and by creating a risk of a methane explo-

sion. *See supra* Part II.B.2.c. These findings were based, in part, on the existing site conditions. "The remedy at the Metamora Landfill is designed to exist for a minimum of [thirty] years," Stip. Facts ¶ 22, and perhaps longer if, for example, in thirty years there remained hazardous material underneath the Landfill cap that would be venting methane, Tr. at 307:14–20 (Testimony of Mr. Williams). Plaintiff's Lease expires in 2019. *See* JX 1 (Lease ¶ 2, providing for a fifty-year term "from and after the 1st day of August 1969"). When plaintiff's Lease expires, the remedy at the Metamora Landfill site will still be in place. Plantiff's mining or presence in the AIC at any time during plaintiff's Lease term will cause the same nuisances.

The court can conceive of no remedy that would abate the methane nuisance and prevent an adverse impact on the existing remediation that would not also completely prohibit plaintiff from mining in the AIC. Thus, the " 'destruction' " of plaintiff's right to mine in the AIC is " 'essential to the public safety[ ][and] health.' " *See Osborn*, 72 N.W. at 985 (" 'The police power is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction and abatement by summary proceedings of whatever may be regarded as a public nuisance.' " (quoting *Lawton v. Steele*, 152 U.S. 133, 136, 14 S.Ct. 499, 38 L.Ed. 385 (1894))).

The court finds that the power to do what is required to remediate modern environmental hazards inheres in Michigan's police power just as much as the power to abate long-familiar common law public nuisances such as fire or explosion. An example in the *Lucas* case itself indicates that the background principles exception applies to the abatement of modern hazards. The Court stated that "the corporate owner of a nuclear generating plant, when it is directed to remove all improvements from its land upon discovery that the plant sits astride an earthquake fault," would not be entitled to compensation. 505 U.S. at 1029, 112 S.Ct. 2886. This example demonstrates a situation where the government may discontinue a current use without providing compensation. The prevention of a use, as here, is closely analogous.

Because the power to abate a nuisance includes the power to prohibit a use of the property that would cause the nuisance, *Osborn*, 72 N.W. at 985, the court concludes that plaintiff could have been prevented under Michigan law from mining or being present in the AIC. The court finds that defendant, in preventing plaintiff from mining in the AIC, "[did] no more than duplicate the result that could have been achieved in the courts-by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." *Lucas*, 505 U.S. at 1029, 112 S.Ct. 2886.

### III. Conclusion

Based on the evidence presented at trial and for the foregoing reasons, the court determines that defendant is not liable for a taking in this case, both because plaintiff lacks a compensable property interest, and because plaintiff's proposed mining would adversely impact the existing remediation of groundwater contamination and would constitute a failure to exercise due care to protect the public health, safety, and welfare. The court directs the Clerk of the Court to enter judgment in favor of defendant as to all claims of John R. Sand & Gravel Co. No costs.

IT IS SO ORDERED.